The STATE of Ohio, Appellee,

v.

LEACH, Appellant.

[Cite as *State v. Leach*, 150 Ohio App.3d 567, 2002-Ohio-6654.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–020106.

Decided Dec. 6, 2002.

568

Michael K. Allen, Hamilton County Prosecuting Attorney, and Paula E. Adams, Assistant Prosecuting Attorney, for appellee.

Arenstein & Gallagher and William R. Gallagher, for appellant.

---

PAINTER, Presiding Judge.

{¶ 1} We hold that the cumulative effect of the trial court's erroneous admission of evidence denied the appellant, Thomas P. Leach Jr., a fair trial. We also conclude, as part of that holding, that it is error for the state to use a defendant's invocation of his constitutional right to remain silent as substantive evidence of the defendant's guilt in its case-in-chief. This holding applies whether the right has been invoked before or after the defendant has been given his *Miranda* rights.

## I. The Appeal

{¶ 2} A jury found Leach guilty of one count of attempted rape, one count of gross sexual imposition, two counts of kidnapping, and the firearm specifications accompanying each count. (We note that the judgment of conviction inaccurately indicates that the jury found Leach guilty of only one of two firearm specifications attached to the fourth count, a kidnapping charge; the verdict form demonstrates that the jury found him guilty of both firearm specifications.) Leach was sentenced to an aggregate term of 12 years' imprisonment.

{¶ 3} In his appeal, Leach raises four assignments of error. He claims that (1) the state violated his rights to a fair trial and due process of law by introducing evidence that he had invoked his right to remain silent and to request an attorney and by improperly remarking in closing argument that he had failed to subpoena certain witnesses; (2) he was denied effective assistance of counsel because his trial counsel failed to object to improper evidence; (3) the trial court erred by admitting opinion testimony; and (4) he was denied a fair trial because of the cumulative effect of all the errors.

{¶ 4} We address only those assignments concerning the erroneous admission of evidence and its cumulative impact. Because we conclude that Leach was deprived of a fair trial and resultantly reverse his conviction, we need not address his claim of ineffective assistance of counsel.

## II. The Evidence at Trial

{¶ 5} This is a case based entirely on the credibility of the witnesses. Sarah Sheblessy, at her teen-aged daughter Madeline's suggestion, hired Madeline's friend, Ashlee Decker, to feed the family's four cats while she and Madeline were

away on a week's vacation. (We refer to Sarah and Madeline Sheblessy by their first names for the sake of clarity.) Leach and Sarah were friends. Sarah left a note for Decker that Leach could be contacted should an emergency occur. Sarah feared that the home's sump pump would malfunction. She also gave Leach permission to enter the house to do laundry while she was on vacation, after warning him not to be in the house while Decker was present. Sarah feared that Decker would make false accusations against Leach.

{¶ 6} One evening, Decker and her friend, April Crosthwaite, decided to spend the night in the Sheblessy home. They called Madeline for permission. It was disputed whether Decker and Crosthwaite obtained permission to spend the night. Sarah testified that they did not have permission. Decker and Crosthwaite believed that they had obtained permission through Madeline. Madeline testified that she had given Decker permission to spend the night in spite of her mother's refusal to do so.

{¶ 7} The two women spent the night in Madeline's bed. During the early morning hours, a man awakened Decker by straddling her hips and pointing a gun at her head. When Decker crossed her arms over her chest in a protective posture, the man tried to pry them apart. Crosthwaite awoke, saw the man, and began to cry. The man leaned toward Crosthwaite and pointed the gun at her head. The man alternated in leaning toward one woman and then the other woman, while pointing the gun at each woman's head. He eventually put his hands under Crosthwaite's shirt and fondled her breast. At one point, he said, "We can do this the easy way or the hard way." When Decker heard the man's voice, she recognized it as Leach's and called out his name. (She had attended a picnic with him and the Sheblessys earlier that year.)

{¶ 8} According to the women, Leach stated that he just wanted to talk to Decker. She agreed to talk to him in Sarah's bedroom after requesting that he put down the gun. He placed it in his duffle bag by Madeline's bedroom door and entered Sarah's bedroom with Decker. Decker turned on all the lights in the area. According to Decker, Leach sat on the bed and began talking, stating that he might be perceived as a "sexaholic" and had heard that Decker might have a similar reputation. Meanwhile, they heard Crosthwaite crying in the other bedroom. Leach asked Decker to attend to Crosthwaite. Decker helped Crosthwaite into the bathroom, where Crosthwaite vomited into the toilet. Soon Leach, accompanied by Decker, exited through the front door, taking his duffle bag with him.

{¶ 9} After Leach had left, the women discovered that the receiver for the kitchen telephone had been taken off the hook. They called for emergency assistance. Before providing any information to the emergency operator, however, Crosthwaite hung up and called her mother to seek advice. Crosthwaite's

mother told the women to call the police. But before they could do so, the emergency operator called them. The police arrived, took their statements, and photographed the scene, and the women called Sarah.

{¶ 10} Leach's defense was that Decker and Crosthwaite did not have permission to be in the house, that Decker had been using the house for parties, and that the women had lied about the attack to avoid getting in trouble with Sarah. There was also evidence that Leach may have believed that Sarah had asked him to remove the women from her house.

### III. Improper Evidence

#### A. Evidence of Invocation of Rights

{¶ 11} In his first assignment, Leach argues that his rights to a fair trial and due process were violated when Sergeant Thomas Corbett, a member of the Hamilton County Sheriff's Department, testified on direct examination that Leach had requested to contact an attorney before speaking with him. Leach also challenges the introduction of the signed waiver of his Miranda[1] rights. (The Miranda warnings include the "right to remain silent, that any statement [a person] does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."[2]) Leach also argues that the assistant prosecutor's comment in closing argument regarding his failure to subpoena two witnesses improperly suggested that Leach had some burden of proof that he had failed to meet.

{¶ 12} Sergeant Corbett testified that Sarah had informed the police that Leach wished to speak with them. Sergeant Corbett had contacted Leach. The assistant prosecutor asked for the content of the conversation. Before Sergeant Corbett could respond, Leach's counsel objected on the basis of inadmissible hearsay, claiming that Leach's portion of the conversation would not be incriminating (presumably arguing either that Leach's statements were hearsay because they did not constitute a party-opponent admission under Evid.R. 801[D][2] or that they were not an exception to hearsay as a statement against interest under Evid.R. 804[B][3] ). The trial court stated in the presence of the jury that if the statements were not incriminating, he would sustain the objection, indicating that he would otherwise allow the introduction of incriminating statements.

{¶ 13} Sergeant Corbett then testified that Leach had agreed to talk to Sergeant Corbett at a designated time and date. When Sergeant Corbett testified that Leach had not kept the appointment, the assistant prosecutor

---

1. *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

2. Id. at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694.

asked, "Did you talk to him anymore?" Sergeant Corbett responded that Leach had left a message stating that he wanted to speak with an attorney before speaking with the police. The assistant prosecutor asked, "[O]nce he said he wanted to talk to an attorney, did you make any attempts to contact him again?" Sergeant Corbett responded, "No." The trial court failed to make an explicit ruling on the objection to this line of questioning.

{¶ 14} When asked by the assistant prosecutor to explain the next step of his investigation, Sergeant Corbett testified that he had received a telephone message from Leach's attorney. The trial court sustained an objection against admission of further testimony regarding that conversation.

{¶ 15} Sergeant Corbett testified that he arrested Leach the following day. He identified Leach's executed waiver of *Miranda* rights. The assistant prosecutor asked whether Leach had agreed to talk to the officer after signing the form. Sergeant Corbett testified that Leach provided his name and address and answered several questions. At that juncture, Leach's attorney requested a sidebar, arguing that the prejudicial effect of the statement about to be offered exceeded its probative value. The trial court refused to grant the sidebar and overruled the objection.

{¶ 16} The assistant prosecutor then asked if anything else had been said. Sergeant Corbett testified that Leach had requested an attorney and that as a result he terminated the interview. The assistant prosecutor then asked Sergeant Corbett to explain what would occur when a defendant asked to speak with an attorney. Sergeant Corbett testified that he would end the interview except for identification-type questions.

{¶ 17} After the state's case-in-chief, it sought to have the *Miranda* rights form admitted into evidence. Leach objected, arguing that the form had no relevance. The trial court overruled the objection and stated that the state was required to use the form because Leach had invoked his constitutional right to speak to an attorney. Strangely enough, the trial court then stated that the admission of the form was "harmless beyond a reasonable doubt."

{¶ 18} In the first instance, the state used in its case-in-chief the fact that, before he was arrested or provided his *Miranda* rights, Leach had refused to speak to the police until he had contacted an attorney. In the latter situation, the state used in its case-in-chief the fact that, after he had been arrested and provided his *Miranda* rights, Leach had requested an attorney and would not answer further questions. The assistant prosecutor foreshadowed the admission of Leach's silence by commenting in her opening statement that, after agreeing to meet with the police, Leach called back and said that he "wanted an attorney."

{¶ 19}   Before beginning our analysis, we need to make a few observations.   The expressed desire to speak to an attorney before further speaking to a police officer invokes a defendant's Fifth Amendment right to remain silent, and a comment on the request to speak to an attorney is a comment on the defendant's right to remain silent.[3]   Further, we see no difference between a comment by the state on a defendant's invocation of the right to speak with an attorney and to remain silent and the elicitation of the same information through the questioning of a state's witness.   Both constitute "evidence that came before the jury through the efforts and design of the prosecution."[4]   And because Leach did not testify at trial, the state did not elicit Sergeant Corbett's testimony about Leach's invocation of his right to counsel and to remain silent for purposes of impeachment.

### 1.   Impeachment by Silence

{¶ 20}   The state did not use Leach's silence for impeachment.   But a discussion of the two principal United States Supreme Court decisions concerning the impeaching use of silence before and after the provision of *Miranda* rights is necessary to provide the background for the decisions that have considered the use of silence as substantive evidence.

{¶ 21}   The Supreme Court has addressed the use of post-*Miranda* silence for impeachment.   In *Doyle v. Ohio*,[5] the court held that impeaching a defendant by the fact that he remained silent after he had been arrested and given his *Miranda* warnings violated the Due Process Clause of the Fourteenth Amendment.   The court determined that because a person's silence after being provided *Miranda* warnings might be merely the exercise of those rights, "every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested."[6]   The court further explained that it would be "fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial" when the defendant had been implicitly assured by the state that he would not be penalized for remaining silent.[7]   "[T]he unfairness occurs when the prosecution, in the presence of the jury, is allowed to undertake impeachment on

---

3.   Accord *Combs v. Coyle* (C.A.6, 2000), 205 F.3d 269, 279, certiorari denied sub nom. *Bagley v. Combs* (2000), 531 U.S. 1035, 121 S.Ct. 623, 148 L.Ed.2d 533; *State v. Treesh* (2001), 90 Ohio St.3d 460, 479, 739 N.E.2d 749.

4.   *Coppola v. Powell* (C.A.1, 1989), 878 F.2d 1562, 1567.

5.   *Doyle v. Ohio* (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91.

6.   Id. at 617–618, 96 S.Ct. 2240, 49 L.Ed.2d 91.

7.   Id. at 618, 96 S.Ct. 2240, 49 L.Ed.2d 91.

the basis of what may be the exercise of [the right to remain silent]."[8] An exception to the use of silence for impeachment occurs when the defendant puts his silence into question, "either by raising the issue first, or by testimony that stands in direct contradiction to silence."[9]

{¶ 22} In *Jenkins v. Anderson*,[10] the Supreme Court held that "impeachment by use of prearrest silence does not violate the Fourteenth Amendment." This is because common law "traditionally has allowed witnesses to be impeached by their previous failure to state a fact in circumstances in which [the] fact naturally would have been asserted"[11] and because, in the absence of an arrest or *Miranda* warnings, governmental action has not induced the defendant to remain silent.[12]

{¶ 23} It also held that "the Fifth Amendment is not violated by the use of prearrest silence to impeach a criminal defendant's credibility."[13] The Fifth Amendment is not violated because by taking the stand, the defendant casts aside "his cloak of silence and [impeachment] advances the truth-finding function of the criminal trial."[14]

{¶ 24} The Supreme Court determined that "[e]ach jurisdiction may formulate its own rules of evidence to determine when prior silence is so inconsistent with present statements that impeachment by reference to such silence is probative."[15]

### 2. *Substantive Use of Postarrest Invocation of Rights*

{¶ 25} Leach argues that Sergeant Corbett's testimony violated his due-process right to a fair trial. His due-process argument is applicable to his request for an attorney (and thus the invocation of his right to remain silent[16]) post-*Miranda*. In a post-*Miranda* situation, the Due Process Clause is violated when the state promises that an arrested person's silence will not be used against

---

8.  See id. at 619, 96 S.Ct. 2240, 49 L.Ed.2d 91, fn. 10.

9.  See Strauss, Silence (2001), 35 Loy.L.A.L.Rev. 101, 111, and cases cited therein.

10.  See *Jenkins v. Anderson* (1980), 447 U.S. 231, 240, 100 S.Ct. 2124, 65 L.Ed.2d 86.

11.  See id. at 239, 100 S.Ct. 2124, 65 L.Ed.2d 86.

12.  See id. at 240, 100 S.Ct. 2124, 65 L.Ed.2d 86.

13.  See id. at 238, 100 S.Ct. 2124, 65 L.Ed.2d 86.

14.  See id. at 238, 100 S.Ct. 2124, 65 L.Ed.2d 86.

15.  See id. at 239, 100 S.Ct. 2124, 65 L.Ed.2d 86.

16.  See *Wainwright v. Greenfield* (1986), 474 U.S. 284, 295, 106 S.Ct. 634, 88 L.Ed.2d 623, fn. 13.

him and then breaches that promise by using his silence as substantive evidence in its case-in-chief.[17]

{¶ 26} Whether evidence is used for impeachment or as substantive evidence, the analysis is the same once a person has been given *Miranda* warnings. "[T]he State gives warnings to protect constitutional rights and implicitly promises that any exercise of those rights will not be penalized. In both situations, the State then seeks to make use of the defendant's exercise of those rights in obtaining his conviction. The implicit promise, the breach, and the consequent penalty are identical in both situations."[18]

{¶ 27} The prejudicial impact of the use of post-*Miranda* silence cannot be ignored. It has been said by some that an innocent person has nothing to hide. To those people, a defendant who is unwilling to speak without counsel present is guilty or at least hiding some truth. "[S]ilence in the face of accusation is itself damning and will bode ill when presented to a jury."[19]

{¶ 28} As explained by the Sixth Appellate District in *State v. Sabbah*,[20] a case where the state used the defendant's silence for impeachment, "References to prior silence in the presence of the jury inevitably precipitate the impermissible inference that a failure to deny an accusation of guilt, or assert its contrary, is an admission of the accusation's truth. * * * Needless to say, the inference is an extremely tenuous one since there are frequently competing, equally plausible explanations for a defendant's silence at the time of his arrest."

{¶ 29} The Ohio Supreme Court has also admonished prosecutors not to comment on postarrest silence because such comments raise an inference of guilt and penalize a defendant's right to remain silent.[21] It has explained that prosecutors must "be aware that where such comments work to the material prejudice of the defendant, they will not be tolerated."[22]

---

**17.** Accord id. See *Franklin v. Duncan* (N.D.Cal.1995), 884 F.Supp. 1435; *United States v. Szymaniak* (C.A.2, 1991), 934 F.2d 434; *State v. Evans* (1981), 96 Wash.2d 1, 633 P.2d 83.

**18.** See *Wainwright v. Greenfield*, 474 U.S. at 292, 106 S.Ct. 634, 88 L.Ed.2d 623; *State v. Rogers* (1987), 32 Ohio St.3d 70, 512 N.E.2d 581.

**19.** See *Miranda v. Arizona*, 384 U.S. at 468, 86 S.Ct. 1602, 16 L.Ed.2d 694.

**20.** See *State v. Sabbah* (1982), 13 Ohio App.3d 124, 133, 13 OBR 155, 468 N.E.2d 718.

**21.** See *State v. Thompson* (1987), 33 Ohio St.3d 1, 4, 514 N.E.2d 407; Accord *State v. Hill* (2001), 92 Ohio St.3d 191, 749 N.E.2d 274 (use of post-*Miranda* silence is error, but not plain error).

**22.** See *State v. Thompson*, 33 Ohio St.3d at 4, 514 N.E.2d 407.

{¶ 30} There are many innocent reasons why an arrestee might invoke his right to remain silent: fear, desire for advice, or not wanting his words to be misconstrued. This court has recognized the danger of informing a jury that a defendant has exercised his constitutional right not to speak. In *State v. Jones,* we said that it is impermissible for the state to elicit testimony that a defendant has invoked his right to counsel "precisely so that a jury does not learn what happened during the course of an interview, as the invocation of the right to counsel casts an improper implication of guilt."[23] This is exactly what happened here—the state, for no reason other than to imply guilt, informed the jury that Leach would not speak to the police without his counsel.

### 3. Substantive Use of Prearrest Invocation of Rights

{¶ 31} Because prearrest, pre-*Miranda* silence does not implicate the assurance from the state that the silence will not be used punitively, due process principles are not implicated.[24] What is implicated is the Fifth Amendment privilege against self-incrimination.

{¶ 32} The United States Supreme Court has not addressed whether the use of prearrest, pre-*Miranda* silence by the state as substantive evidence of guilt violates constitutional rights. The federal circuits that have considered the issue have done so in the context of the Fifth Amendment privilege against self-incrimination, and they have not agreed.[25] The circuits holding prearrest, pre-*Miranda* silence inadmissible to prove guilt have based their conclusions on the fact that the right to remain silent is not derived from *Miranda,* but from the Fifth Amendment; that the right attaches before the commencement of formal adversary proceedings; and that the right is not limited to persons in custody or charged with a crime.[26] The circuits holding otherwise have based their conclusion on the lack of governmental coercion in a prearrest setting.[27]

{¶ 33} The right to remain silent is conferred by the United States and the Ohio Constitutions. The privilege against self-incrimination "is fulfilled

---

23. See *State v. Jones* (Aug. 28, 1998), 1st Dist. No. C–970043, 1998 WL 542713. See, also, *State v. Watson,* 1st Dist. No. C–010691, 2002-Ohio-4046, at ¶ 40, 2002 WL 1817327 (testimony that defendant refused interview post-*Miranda* is constitutionally impermissible).

24. See *State v. Easter* (1996), 130 Wash.2d 228, 236–237, 922 P.2d 1285.

25. See Strauss, 35 Loy.L.A.L.Rev. at 130–137 (the First, Sixth, Seventh, and Tenth Circuits hold that the introduction of prearrest, pre-*Miranda* silence violates the Fifth Amendment, and the Fifth, Ninth, and Eleventh Circuits hold otherwise).

26. See *People v. Welsh* (Colo.App.2002), 58 P.3d 1065.

27. See id.

only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' "[28] As explained by Justice Marshall in his dissent in *Jenkins v. Anderson*,[29] "The privilege prohibits the government from imposing upon citizens any duty to present themselves to the authorities and report their own wrongdoing." When the state is allowed to comment on prearrest silence, the "accused has effectively lost the right to silence. A 'bell once rung, cannot be unrung.' "[30]

{¶ 34} The Sixth Circuit has concluded that "use of a defendant's prearrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination."[31] Such a use "substantially impair[s] the policies behind the privilege," i.e., to prevent subjection of a suspect to "self-accusation, perjury or contempt,"[32] and adds "virtually nothing to the reliability of the criminal process."[33] The Sixth Circuit explained, "Because in the case of substantive use a defendant cannot avoid the introduction of his past silence by refusing to testify, the defendant is under substantial pressure to waive the privilege against self-incrimination either upon first contact with the police or later at trial in order to explain the prior silence. Perhaps most importantly, use of a defendant's prearrest silence as substantive evidence of guilt substantially impairs the 'sense of fair play' underlying the privilege. Unlike the case of impeachment use, the use of defendant's prior silence as substantive evidence of guilt actually lessens the prosecution's burden of proving each element of the crime."[34] But the fact of silence is actually of minimal probative value because there are many reasons why a suspect may remain silent.[35]

{¶ 35} Another reason to foreclose the use of prearrest silence in the state's case-in-chief is to discourage improper police tactics. For to hold otherwise would "encourage delay in reading the *Miranda* warnings so officers could

---

28. See *Miranda v. Arizona*, 384 U.S. at 460, 86 S.Ct. 1602, 16 L.Ed.2d 694, quoting *Malloy v. Hogan* (1964), 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653.

29. See *Jenkins v. Anderson*, 447 U.S. at 250 100 S.Ct. 2124, 65 L.Ed.2d 86 (Marshall, J., dissenting).

30. See *State v. Easter*, 130 Wash.2d at 238–239, 922 P.2d 1285, quoting *State v. Trickel* (1976), 16 Wash.App. 18, 30, 553 P.2d 139.

31. See *Combs v. Coyle*, 205 F.3d at 283.

32. See id. at 285.

33. See id. at 286.

34. See id. at 286.

35. See id.

preserve the opportunity to use the defendant's prearrest silence as evidence of guilt."[36]

{¶ 36} The Ohio Supreme Court has not explicitly addressed the issue of whether prearrest, pre-*Miranda* silence can be used in the state's case-in-chief. But in *State v. Combs*,[37] it determined that where a defendant was in custody and had the right to remain silent, to consult an attorney, and to be given *Miranda* warnings (but had not been given the warnings), the defendant's invocation of his rights could not be used as substantive evidence of guilt.[38] The majority of Ohio appellate courts have "held that the introduction of the defendant's silence to the authorities during the state's case-in-chief, regardless of whether the *Miranda* warnings were given, is inappropriate in a situation where it is obviously used as nothing but substantive evidence of guilt."[39]

{¶ 37} This court concluded in *State v. Shea*[40] that the interjection of a defendant's prearrest silence in the state's opening statement was error, but nonprejudicial. In *Shea,* the defendant contacted the police and indicated that the victim's father was looking for him for the alleged sexual abuse of the victim. When the officer began asking questions, the defendant refused to answer. We concluded, "Defendant's silence cannot possibly be used to impeach his credibility when he has yet to testify. Mention of defendant's prearrest silence at trial is to be used by the state as a 'shield' to prevent the defendant from having the considered opportunity to construct a convenient, and unquestioned, exonerating story. Defendant's prearrest silence, in conformity with the rights the Fifth Amendment to the United States Constitution is designed to protect, should not be used as a 'sword' to provide the initial proof of defendant's guilt."[41]

{¶ 38} Here, the state elicited evidence of Leach's refusal to speak with Sergeant Corbett and his failure to keep his appointment, both of which were used to imply guilt.[42] The state wrongly used this evidence as a sword.

---

36. See *State v. Easter,* 130 Wash.2d at 239, 922 P.2d 1285.

37. See *State v. Combs* (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071.

38. See *State v. Combs,* 62 Ohio St.3d at 281–282, 581 N.E.2d 1071.

39. See *State v. Geboy* (2001), 145 Ohio App.3d 706, 764 N.E.2d 451, and cited cases. But, see, *State v. Margroff* (Nov. 21, 1984), 8th Dist. No. 48037, 1984 WL 3622.

40. See *State v. Shea* (July 17, 1985), 1st Dist. No. C–840806, 1985 WL 8938.

41. See id. Accord *State v. Geboy,* supra; *State v. Burke* (Sept. 13, 1989), 4th Dist. No. 87 CA 40, 1989 WL 106927.

42. See *State v. Lewis* (1996), 130 Wash.2d 700, 706, 927 P.2d 235.

{¶ 39} Leach clearly invoked his Fifth Amendment privilege against self-incrimination by telling Sergeant Corbett that he wanted to speak to an attorney both before he was arrested and after he was arrested. We conclude that it was error for the state to elicit evidence of Leach's silence both pre-*Miranda* and post-*Miranda*. Unfortunately, the dissent invokes the phantom "description of the investigation" rubric as an exception to the Fifth Amendment. While this false doctrine usually surfaces when the state attempts to elicit hearsay, its advancement here is equally untenable.[43]

{¶ 40} We must still determine, however, whether the error warrants reversal.

### 4. Standards of Review

{¶ 41} Leach's counsel objected to testimony concerning Leach's pre-*Miranda* refusal to speak without an attorney on the basis of hearsay. This was not the proper objection. Further, he failed to object to the assistant prosecutor's comment during her opening statement. Thus, we must review for plain error under Crim.R. 52(B).[44] Under a plain-error analysis, we "must examine the error asserted by the [defendant] in light of all of the evidence properly admitted at trial and determine whether the jury would have convicted the defendant even if the error had not occurred."[45] Thus, "[r]eversal is warranted only if the outcome of the trial clearly would have been different absent the error."[46]

{¶ 42} The state, in its opening statement, commented on the fact that, after making an appointment with the police, Leach called back and said that he wanted to speak to an attorney. The jury also heard testimony from Sergeant Corbett that Leach had decided to speak with an attorney rather than to meet with the police. The assistant prosecutor emphasized the testimony by summarizing the fact before continuing her questions. Further, included in the comments heard by the jury before Sergeant Corbett provided the testimony was the statement by the trial court that it would sustain Leach's counsel's hearsay objection if the anticipated testimony was *not* incriminating. The trial court neither sustained nor overruled the objection. Thus, the testimony that Leach

---

**43.** See *State v. Thompkins* (Nov. 22, 1995), 1st Dist. No. C–940513, 1995 WL 688789. reversed in part on other grounds, (1997), 78 Ohio St.3d 380, 678 N.E.2d 541.

**44.** See *State v. Hill* (2001), 92 Ohio St.3d 191, 202, 749 N.E.2d 274.

**45.** See id. at 203, 749 N.E.2d 274, quoting *State v. Slagle* (1992), 65 Ohio St.3d 597, 605, 605 N.E.2d 916.

**46.** See id.

canceled the appointment with the police because he wanted to speak with an attorney could have easily been perceived by the jury as incriminating since the trial court made no explicit ruling on it.

{¶ 43} In spite of this, however, we cannot say that, but for the error, the outcome of the case would have been different. Thus, standing alone, the admission of Leach's pre-*Miranda* statement would not result in a reversal of his conviction under a plain-error analysis. But when this evidence is considered with other inadmissible evidence, it adds to the cumulative effect addressed in Leach's fourth assignment.

{¶ 44} Trial counsel argued that evidence of Leach's post-*Miranda* refusal to speak was more prejudicial than probative. This objection, while failing to additionally encompass the constitutional concerns, was proper to the extent it was lodged. Thus, the admission of this evidence must be reviewed under a harmless-error analysis. In order for the error to be harmless, we "must find beyond a reasonable doubt that the error did not contribute to the verdict."[47]

{¶ 45} The state elicited from Sergeant Corbett that Leach had refused to speak with him after being given his Miranda rights. The jury's verdict depended entirely upon whom it chose to believe because there was no physical evidence implicating Leach. Further, there was some evidence to support Leach's claim that Decker and Crosthwaite had fabricated their story to keep from getting in trouble for being in the Sheblessy house overnight without permission and for having parties there while the Sheblessys were on vacation. We cannot say beyond a reasonable doubt that the evidence of Leach's guilt was so overwhelming that the error did not contribute to Leach's conviction. Thus, we sustain this portion of Leach's assignment. While this error, standing alone, would mandate reversal, we continue our review of whether other contested evidence was properly admitted.[48]

### B. Admission of Miranda Waiver Form

{¶ 46} Leach also challenges the admission of his *Miranda* waiver form. Counsel objected to its admission. The form was admitted and sent to the jury room with other exhibits. There was no question that Leach had been given his *Miranda* rights. Further, Leach only provided identification information to the officers before invoking his right to remain silent.

---

47. See *State v. Johnson* (1994), 71 Ohio St.3d 332, 339, 643 N.E.2d 1098.

48. Accord *State v. Hill*, supra.

{¶ 47} There was no purpose for the admission of the form except as further emphasis of Leach's invocation of his Fifth Amendment rights. The form was irrelevant and improperly admitted. Whether or not the admission of this form, standing alone, would mandate reversal, it certainly adds to the cumulative effect addressed in Leach's fourth assignment.

### C. State's Comment on Failure to Subpoena Witnesses

{¶ 48} Leach also argues that, by pointing out that he had failed to subpoena or call two witnesses, the state suggested that he had some burden of proof. Pointing out the failure of a defendant to subpoena witnesses to prove his theory of the case does not constitute shifting-of-the-burden misconduct.[49]

{¶ 49} But because it was error to admit evidence of Leach's post-*Miranda* right to remain silent, we sustain Leach's first assignment in part.

### IV. Lay Opinion Testimony

{¶ 50} In his third assignment, Leach argues that the trial court erred by allowing Detective Greg Dean to testify that a large-framed man sitting on the bed had made the imprint on the bedcover in Sarah Sheblessy's bedroom. This testimony corroborated the victims' testimony. Dean photographed the bed and stated on direct examination that the photograph of the bed was important because he had information that the "perpetrator had sat on that bed."

{¶ 51} When asked why he took the photograph, he testified, "[U]p around the headboard around the pillow area, there was a big indentation, where it looked to be a large-framed individual had sat there. The covers were still indented, looked like a shovel on the bed, so I tried to get the best shot of that that I could. *I felt that that put him there.*" The trial court overruled Leach's objection to that characterization.

{¶ 52} On cross-examination, the detective testified that he believed the indentation had been made by someone sitting on the bed "from seeing throughout [his] life what indentation of butt prints on made beds looked like." He admitted that he did not know what had caused the indentation or whose posterior may have caused the indentation. He testified that he did not know for a fact that anyone had sat on the bed "[o]ther than the testimony given to [him] from the victim."

{¶ 53} Under Evid.R. 701 and 704, a lay opinion on the ultimate issue to be decided by the trier of fact can be given if the standards of admissibility under

---

**49.** See *State v. Adams* (Aug. 24, 2001), 1st Dist. Nos. C–000388, C–000389, and C–000390, 2001 WL 958899, quoting *State v. Lane* (1976), 49 Ohio St.2d 77, 86, 3 O.O.3d 45, 358 N.E.2d 1081, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3148, 57 L.Ed.2d 1155.

Evid.R. 701 are met.[50] Under Evid.R. 701, "lay opinion must be: (1) 'rationally based on the perception of the witness,' i.e., the witness must have firsthand knowledge of the subject of his testimony and the opinion must be one that a rational person would form on the basis of the observed facts; and (2) 'helpful,' i.e., it must aid the trier of fact in understanding the testimony of the witness or in determining a fact in issue."[51] In this case, Detective Dean was testifying as a lay witness. He opined that a large-framed person had made the indentation in the bedcover and that the indentation put "the perpetrator" at the scene. (Because Leach was the only suspect from the beginning and the jury had been made aware of this, the perpetrator Dean referred to could only have been Leach.)

{¶ 54} We have a problem with the admission of Dean's conclusion that the imprint on the bed placed Leach at the scene. At the time he informed the jury that the imprint put Leach at the scene, there was nothing in the record to show that Dean had personal knowledge of Leach's size or what would have constituted a "large-framed" individual. Because Dean did not observe Leach on the bed, his conclusion that Leach had sat on the bed on the night in question was not an opinion rationally based on his own perception. It was nothing more than speculation or, at most, an inference drawn from Decker's statement, and not from the detective's firsthand knowledge.

{¶ 55} Further, Dean's opinion was not helpful to the jury. The jury had before it the photograph of the bedcovers and Leach himself. Dean "was in no better position than the jurors to arrive at a conclusion based upon the evidence presented and their own observations of [Leach's] physical being."[52] The jury was capable of deciding whether Leach had sat on the bed without the aid of Dean's opinion. What the opinion did do, however, was lend credibility to the testimony of Decker, to Leach's prejudice.

{¶ 56} Thus, we conclude that Detective Dean's testimony that the print on the bedcover placed Leach at the scene was an inadmissible lay opinion. Moreover, the danger of unfair prejudice and misleading of the jury outweighed any probative value the opinion might have had. We conclude that the erroneous admission of Detective Dean's opinion was an abuse of discretion. But, by itself, the admission of the opinion did not constitute reversible prejudice. Thus, we overrule the assignment. We note, however, that the admission of the opinion added to the cumulative effect of the improperly admitted evidence.

---

50. See *Lee v. Baldwin* (1987), 35 Ohio App.3d 47, 49, 519 N.E.2d 662.

51. See id.

52. See *State v. Berry* (Feb. 12, 1999), 2d Dist. No. 17155, 1999 WL 63853.

### V.  Cumulative Error

{¶ 57}  In his fourth assignment, Leach argues that the cumulative effect of the errors deprived him of a fair trial.  Under the doctrine of cumulative error, "a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal."[53]  The doctrine of cumulative error is inapplicable where there are not multiple instances of harmless error.[54]  Further, "[e]rror in the admission of evidence is harmless if 'there is no reasonable possibility that the evidence may have contributed to the accused's conviction, and * * * in such cases there must be overwhelming evidence of the accused's guilt or some other indicia that the error did not contribute to the conviction.' "[55]

{¶ 58}  In this case, where the evidence of guilt was not overwhelming, we cannot say that there is no reasonable probability that the erroneous admission of evidence contributed to Leach's conviction.  We conclude that the cumulative effect of the errors identified by Leach rendered his trial unfair.  We sustain his fourth assignment.

### VI.  Conclusion

{¶ 59}  Accordingly, we reverse the trial court's judgment and remand this case to the trial court for further proceedings consistent with this opinion and the law.

Judgment reversed
and cause remanded.

GORMAN, J., concurs.

SUNDERMANN, J., dissents.

SUNDERMANN, Judge, dissenting.

{¶ 60}  I respectfully dissent.  On the evening of August 7, 2001, two young ladies were asleep in a bedroom.  At about 2:00 a.m., one of them was awakened and found Thomas Leach straddling her and holding a gun to her head.  He pointed the gun at both of the young ladies and said, "We can do this the easy way or the hard way."  He put his hand down the shirt of one of the women,

---

**53.**  See *State v. Garner* (1995), 74 Ohio St.3d 49, 64, 656 N.E.2d 623.

**54.**  See id.

**55.**  See *State v. Echols* (1998), 128 Ohio App.3d 677, 716 N.E.2d 728, quoting *State v. DeMarco* (1987), 31 Ohio St.3d 191, 195, 31 OBR 390, 509 N.E.2d 1256.

touching her breast and nipple area. The majority opinion refers to a man's doing this. It is clear from the testimony that the man was Thomas Leach. Following a trial, a jury found Leach guilty of attempted rape, gross sexual imposition, two counts of kidnapping, and two firearm specifications.

{¶ 61} The majority opinion would overturn these convictions based on the testimony of Sergeant Corbett. The first portion of Corbett's testimony was as follows:

{¶ 62} "Q. Okay. And what was the content of that conversation?

{¶ 63} "A. I asked Thomas Leach, I told him that I had been made aware that he wanted to talk to the police about what had occurred at the house that night, and I made arrangements. He said he would come in and talk to me at 2:30 in the afternoon on the 8th.

{¶ 64} "Q. Okay. And did he, in fact, do that?

{¶ 65} "A. No.

{¶ 66} "Q. Did you talk to him any more?

{¶ 67} "A. I believe I contacted him. Either I contacted him—I know he left a message on my machine in regards to he wanted to speak with an attorney before talking with the police.

{¶ 68} "Q. So at that point in time, once he wanted to talk to an attorney, did you make any attempts to contact him again?

{¶ 69} "A. No.

{¶ 70} "Q. What did you do next as part of your investigation?

{¶ 71} "A. I believe my next step was I had a short conversation with, I believe, another attorney, or a message was left on my machine from another attorney that Mr. Leach had spoke to."

{¶ 72} All of this testimony concerned the period before Leach was brought into the station and given his *Miranda* warnings. The majority opinion admits that there is no authority from either the United States or the Ohio Supreme Court to exclude this pre-*Miranda* testimony. The testimony did not contain any statements made by Leach and does not imply guilt; rather it was merely an explanation of the investigation up to that point. Absent any authority to the contrary from the higher courts, the convictions for the serious offenses committed here should not be overturned based solely on pre-*Miranda* testimony.

{¶ 73} Sergeant Corbett arrested Leach the day after that conversation. At that time, Leach was given his *Miranda* rights and signed a form acknowledging that he had received his *Miranda* warnings. The next portion of the testimony of Sergeant Corbett was as follows:

{¶ 74} "Q. And upon his arrest, before you got to District 1, was there any conversation or statements between yourself and the defendant?

{¶ 75} "A. No, I don't believe so.

{¶ 76} "Q. And upon arrival at the Sheriff's Department, you then go through a – to a room, I presume?

{¶ 77} "A. That's correct, an interview room

{¶ 78} "Q. You go through the form?

{¶ 79} "A. That's correct.

{¶ 80} "Q. And that form indicates that he signed it?

{¶ 81} "A. That's correct, yes.

{¶ 82} "* * *

{¶ 83} "Q. Was anything else said at that point?

{¶ 84} "A. At that point he stated he wished to consult an attorney.

{¶ 85} "Q. And what do you do, at that point, when a defendant says he wants to talk to an attorney?

{¶ 86} "A. We ended the interview except for identification questions."

{¶ 87} This involved, as the majority aptly points out, post-*Miranda* testimony. The United States Supreme Court held in *Doyle v. Ohio*[56] that a defendant cannot be impeached with his post-*Miranda* silence after he has received his *Miranda* rights, because such impeachment violates the Due Process Clause of the Fourteenth Amendment. Blacks Law Dictionary (7th Ed.1999) 755 defines "impeach" as "[t]o discredit the veracity of (a witness)." In *State v. Hill*,[57] the Ohio Supreme Court distinguished *Doyle* by noting that "there was no use of [defendant's] silence for impeachment here, as he did not testify, so this case differs from *Doyle* in a key particular." Because Corbett's second statement came to light during the state's case-in-chief, it was not used to impeach Leach. Therefore, to the extent that the majority has relied on *Doyle,* I believe that reliance is misplaced.

{¶ 88} Moreover, the post-*Miranda* statement was not used, as the majority suggests, in the case-in-chief to infer guilt. The testimony was merely used to describe the investigation. Accordingly, I do not believe it was error to admit it. And even if it was error, it was harmless.

---

56. *Doyle v. Ohio* (1976), 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91.

57. *State v. Hill,* 92 Ohio St.3d at 202, 749 N.E.2d 274.

{¶ 89} Finally, given the overwhelming evidence against Leach, I do not believe that the admission of the contested evidence, even if in error, denied Leach a fair trial.  Therefore, I would affirm.