Hoffman, P.J.
Defendant-appellant John Graber appeals the December 13, 2001 Judgment Entry of the Stark County Court of Common Pleas which found him guilty of two counts of rape and two counts of gross sexual imposition, and sentenced him accordingly. Defendant-appellee is the State of Ohio.
*635 STATEMENT OF THE CASE AND FACTS
On August 30, 2001, the Stark County Grand Jury indicted appellant with two counts of rape, in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree, and two counts of gross sexual imposition, in violation of R.C. 2907.05(A)(4), felonies of the third degree. At his October 19, 2001 arraignment, appellant plead not guilty to the charges.
Appellant married M.G. [hereinafter the mother] in 1992. Together they had two children, J.G. born June 4, 1992, and D.G., born May 19, 1994. In December 1996, appellant and the mother legally dissolved their marriage and appellant was designated the residential parent. Appellant remained the residential parent until July 1999, when the mother obtained custody of the children.
In May, 1999, approximately ten months after the mother obtained custody of the children, D.G. spontaneously revealed that his father had sexually abused him to the babysitter. The babysitter had just turned thirteen years old, and babysat the children on occasion. D.G.'s revelation so shocked the babysitter she did not immediately tell the mother. However, one week later, the babysitter told the mother what D.G. had said.
The mother immediately contacted the police. Canton Police Detective James Armstrong met with the mother on May 9, 2000, along with Diana Ivan, a case worker from the Department of Human Services. Ms. Ivan interviewed the children and made arrangements for the children to be examined at the Akron Children's Hospital CARE Center. Detective Armstrong also contacted appellant, but appellant chose not to speak to him.
At the CARE Center, nurse-practitioner Donna Abbott, and social worker, Sherry Roberts, interviewed the mother without the children present. Ms. Roberts took each child to a private interview room to obtain a physical history from each child.
At the time of the J.G.'s interview, she was seven years old and in the second grade. Ms. Roberts noted she acted reluctant and embarrassed. J.G. knew she was there to discuss what her father had done, but she was unable to say the words. Instead, J.G. asked if she could write the words. J.G. wrote that her father "got on top" of her and "was wiggling" and that "he made [her] take [her] clothes off." Then J.G. began verbally engaging in conversation with Ms. Roberts.
When J.G. was unable to say certain words, such as "peepee" she would write the word on the paper or point to the words that had been written. J.G. told the social worker her father had performed oral sex on her, and that she had been made to perform oral sex on him. J.G. also explained her father had manually and genitally stimulated her genital area. Further, J.G. indicated her father used "red stuff" to rub on her genital area to make it hurt less. She further explained appellant "peed" white stuff on her stomach.
J.G. told Ms. Roberts this abuse occurred every time she and D.G. slept with appellant in his bed. She indicated these events happened at night with the exception of one occasion, and she further indicated she and her brother did not sleep with appellant that often. J.G. explained that D.G. was asleep when her father would behave in this fashion toward her.
Ms. Roberts also attempted to talk to D.G. However, D.G. explained he could not discuss the situation. Ms. Roberts ended the interview.
Donna Abbott performed a physical exam and noted no physical findings of abuse to either J.G. or D.G. Ms. Abbott also testified the lack of physical findings *636 was consistent with the type of abuse reported.
Prior to trial, on December 5, 2001, the trial court conducted an in-camera voir dire of D.G. and J.G. to determine their competency to testify at trial. After talking to both children, the trial court found each child competent to testify.
At the same hearing, the trial court also discussed a pretrial issue raised by the parties. In 1995, J.G. told her grandmother appellant had sexually abused her. DHS became involved in the investigation and conducted an interview with all interested parties, and conducted a physical examination of J.G. After the investigation, DHS concluded the allegations were "unsubstantiated." Therefore, no criminal charges were pursued. December 5, 2001 Hearing Transcript at 48-49.
Appellant wanted to cross-examine the mother on this issue arguing the allegations of sexual misconduct in 1995, impugned the mother's credibility because they were "unsubstantiated." Tr. at 50. After reviewing case law submitted by the parties, the trial court determined the incident was collateral. The trial court explained if it could be demonstrated the victim of abuse had lied, the victim would be subject to cross-examination pursuant to Evid. R. 608(B). However, because the prior allegations had been found to be merely unsubstantiated (as opposed to being established as false), the trial court found the rape shield law applied to prevent further interrogation.
Defense counsel clearly indicated it had no intention of cross-examining the child. Rather, appellant sought only to advance the theory the mother and her mother were involved in a plan or scheme to bring about the current charges against his client. Tr. at 53. The trial court indicated it would not permit appellant to attack the mother's credibility at trial with the 1995 allegations. Apparently J.G.'s physical examination had revealed irritation in the vaginal area, no recantation by the child, and no evidence indicating anyone had lied about anything. Accordingly, the trial court excluded the introduction of such evidence. The matter proceeded to trial on December 6, 2001. To the extent the testimony of the witnesses at trial becomes necessary, it will be addressed in the specific assignments of error herein.
After hearing all of the evidence, the jury found appellant guilty on all charges. The trial court conducted a sentencing hearing on December 10, 2001. In a December 13, 2001 Judgment Entry, the trial court sentenced appellant to serve ten years for each rape count and five years for each gross sexual imposition count. Further, the trial court ordered the rape charges be served consecutively, and the gross sexual imposition charges be served concurrently to each other and the rape charges. It is from this judgment entry appellant prosecutes this appeal, assigning the following errors for our review:
"I. THE TRIAL COURT ERRED BY ALLOWING A SOCIAL WORKER TO TESTIFY AS TO STATEMENTS MADE TO HER BY [J.G.] THAT SHE WAS A VICTIM OF RAPE AND GROSS SEXUAL IMPOSITION BY JOHN GRABER IN VIOLATION OF JOHN GRABER'S RIGHT TO DUE PROCESS GUARANTEED BY THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION PURSUANT TO OHIO RULES OF EVIDENCE 803.4 AND/OR 801(D)(1)(C).
"II. THE COURT ERRED IN FINDING [D.G.] COMPETENT TO TESTIFY AT TRIAL.
"III. DEFENDANT'S DUE PROCESS RIGHTS WERE VIOLATED WHEN THE PROSECUTION SUBMITTED
*637 EVIDENCE OF THE DEFENDANT'S INVOCATION OF HIS RIGHT TO SILENCE AND EMPHASIZED THAT INVOCATION IN CLOSING ARGUMENT.
THIS VIOLATED DEFENDANT'S RIGHTS AS GUARANTEED BY THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS UNDER THE UNITED STATES CONSTITUTION.
"IV. THE COURT ERRED IN DENYING THE DEFENDANT'S REQUEST TO INTRODUCE EVIDENCE THAT IN 1995 [THE MOTHER] MADE ALLEGATIONS THAT JOHN GRABER HAD SEXUALLY MOLESTED [J.G.]. THIS RULING DENIED THE DEFENDANT FUNDAMENTAL DUE PROCESS.
"V. THE DEFENDANT'S TRIAL COUNSEL WAS TOTALLY INADEQUATE AND WAS SO DEFICIENT THAT IT CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL AND VIOLATED JOHN GRABER'S SIXTH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL AT TRIAL.
"VI. THE COURT ERRED IN ADMITTING THE MEDICAL RECORDS OF [J.G.] AND [D.G.] THAT INCLUDED UNREDACTED HEARSAY TESTIMONY AND IRRELEVANT PREJUDICIAL STATEMENTS IN VIOLATION OF EVIDENCE RULE 807 AND JOHN GRABER'S CONSTITUTIONAL RIGHT TO A FAIR TRIAL.
"VII. THE CUMULATIVE EFFECT OF ASSIGNMENTS OF ERROR NOS. I THROUGH 6, RESULT IN THE DENIAL OF THE DEFENDANT'S SIXTH AMENDMENT RIGHT TO A FAIR TRIAL AND CONSTITUTE A DENIAL OF HIS RIGHT TO SUBSTANTIVE DUE PROCESS IN VIOLATION OF THE DEFENDANT'S FOURTEENTH AMENDMENT RIGHTS.
"VIII. THE COURT ERRED IN IMPOSING A MAXIMUM CONSECUTIVE SENTENCE ON THE RAPE CHARGES WHERE NONE OF THE FACTORS LISTED IN 2929.14(C) APPLY AND IN IMPOSING CONSECUTIVE SENTENCES IS CONTRARY TO LAW UNDER R.C. 2929.14(E)(4)."
I.
In appellant's first assignment of error, he maintains the trial court erred in permitting Sherry Roberts, the social worker from Children's Hospital, to testify about the statements J.G. made to her during J.G.'s examination. Appellant claims these statements violated his right to due process, and were admitted in contravention of Evid. R. 803.4 and/or Evid. R. 801(D)(1)(C). We find the statements were properly admitted under Evid. R. 803.4.
The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173, 510 N.E.2d 343. Therefore, we will not disturb a trial court's evidentiary ruling unless we find said ruling to be an abuse of discretion; i.e. unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. State v. Adams (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.
Evid. R. 803.4 provides, in relevant part:
"The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
"(4) Statements for purposes of medical diagnosis or treatment
"Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent."
*638 Appellant first argues J.G.'s statements to the social worker were not for the purposes of medical diagnosis, and therefore, Evid. R. 803.4 does not apply. Specifically, appellant maintains there was no medical diagnosis made at the hospital and no treatment was given to J.G. Appellant argues J.G. knew she was there to talk about her father and was sent there by the State in an attempt to use the medical diagnosis loophole for corroborating evidence.
We find the examinations were for the purposes of medical diagnosis and treatment. The fact the hospital did not diagnose or immediately treat J.G. for any acute medical condition does not negate the fact the interview was conducted for a diagnostic purpose. After a physical examination, the medical records indicated a lack of physical findings. However, Nurse-practitioner Abbott testified no physical findings were expected due to the length of time which had elapsed between the abuse and the examination.
Accordingly, we do not find the trial court abused it discretion in permitting Ms. Roberts to testify with respect to the statements J.G. made to Ms. Roberts for the purpose of medical diagnosis. See State v. Kelly (1994), 93 Ohio App.3d 257, 638 N.E.2d 153 ; State v. Moore, 2002-Ohio-4066, 2002 WL 1821790, Stark App. No. 2001CA00253.
Appellant's first assignment of error is overruled.
II.
In appellant's second assignment of error, he maintains the trial court erred in finding D.G. competent to testify at trial. Specifically, appellant claims when a child states he lies a lot, is only seven years old, and lacks short term memory, the trial court errs in permitting a child to testify. We disagree both with appellant's characterization and with his conclusion.
The competency of a witness to testify at trial is governed by Evid. R. 601, which provides:
"Every person is competent to be a witness except:
"(A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."
In State v. Frazier (1991), 61 Ohio St.3d 247, 574 N.E.2d 483, the Ohio Supreme Court set forth certain factors a trial court must consider to determine whether a child under ten years of age is competent to testify. Frazier held:
"In determining whether a child under ten is competent to testify, the trial court must take into consideration (1) the child's ability to receive accurate impressions of fact or to observe acts about which he or she will testify, (2) the child's ability to recollect those impressions or observations, (3) the child's ability to communicate what was observed, (4) the child's understanding of truth and falsity and (5) the child's appreciation of his or her responsibility to be truthful." Id. at syllabus.
We review a trial court's determination of a witness' competency under an abuse of discretion standard. In demonstrating an abuse of discretion, appellant must show more than error of law or judgment, he must show the trial court's attitude was unreasonable, arbitrary or unconscionable. State v. Adams (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.
In support of his argument, appellant emphasizes the fact that during his voir dire, D.G. admitted he had "lied a lot" in the past. Appellant contends this statement indicated D.G. lacked an appreciation *639 of his responsibility to be truthful. Further, appellant points to D.G.'s inability to answer questions about where he had gone to school the previous year and when school would start to demonstrate his lack of short term memory.
We have reviewed the entire voir dire testimony of D.G. as contained in Vol. I of the trial transcripts on pages 7-25. After our review of this section, we find no abuse of discretion in the trial court's determination D.G. was competent to testify at trial.
Appellant first pointed to D.G.'s inability to answer questions about his school. However, the portion of the transcript upon which appellant relies was quoted out of context, and in an incomplete fashion. The entire quote is as follows:
"THE COURT: Now, what grade are you in there?
"[D.G.]: Second.
"THE COURT: Second grade. And how long have you been going to Fairmount?
"[D.G.]: Ah, six weeks.
"THE COURT: Okay. Where did you go to school last year?
"[D.G.]: I forget.[1]
"THE COURT: You forget where you went to school last year. What school you were at last year?
"[D.G.]: Oh, I was at the same one. Fairmount.
"THE COURT: Fairmount?
"[D.G.]: When I was in first grade.
"THE COURT: So you were there in the first grade?
"[D.G.]: Uh-huh.
"THE COURT: And now you're in the second grade and you're still there.
"[D.G.]:. Yes." Tr. at 11-12.
After completing voir dire, D.G., the trial court stated:
"THE COURT: The young man, [D.G.], presented himself today in front of the Court. He was appropriately dressed-in a pair of cords, I think, and a shirt. He was, his hygiene looked to be more than satisfactory, his hair was neatly-or I guess as neatly combed for the kid as it could be. He, ah, came into the courtroom unhesistantly, if that's a word, came over to the table and sat down. He appeared to be in good spirits, appeared to be aware of his surroundings * * *.
"I asked him who the people were at the table. As the record will indicate, he knew who they were. You know, I think he understood each person's role.
"I don't disagree with Mr. Dionisio on the sense that he, he was not very good as to time, as to when he got out of school, but he knew he had to be in school at 7:20.
"Ah, he was aware that he went to the same school last year.
"I think some of the questions I asked, probably any judge asks confuses kids on occasion.
"But he certainly, he knew the subject matters that he was taking, he knew that he took math, he knew he took cursive, which I think is a good word for a second grader. He lives with his sister, mother, crosses the street with his friends. He's aware of when he has to go, when he has to come.
"I think he answered appropriately in relationship to and the difference between telling the truth and not telling the truth. He understands that you get in trouble when you tell a lie. It's better to tell the truth. That's not fair to other people if you tell a lie.
*640 "You know, I would give him maybe a C as to the date things, but I would give him better grades as to everything else.
"I think the issues that Mr. Dionisio raises may go more to, to the credibility of this witness.
"I think, really, to be honest with you, the telling point to me was the young man says he lies. I said, Have you ever lied before, and he says, Yes, I lie a lot. And to me that's an awareness that the young man knows the difference and I think the issue of credibility, that's an issue of credibility. And I'm going to find that D.G. is competent to testify on tomorrow based upon what I heard and saw here today." Tr. at 28-30. (Emphasis added).
Finally, appellant contends D.G. testified about events which may have happened when he was only two years old in 1996. Therefore, appellant contends D.G.'s lack of memory is even more important. We disagree with appellant's contention.
The indictment specified the crimes against D.G. took place in 1998-1999. Counts one and three of the indictment, relating to J.G., were alleged to have taken place between 1996-1999. Because D.G. did not testify about the rape or gross sexual imposition of his sister, we find this argument without merit. D.G. testified about incidents which took place when he was four and five years old. D.G. reported these incidents to his babysitter approximately one year later, when he was approximately six years old.
We find the trial court's voir dire of D.G. indicated D.G. may had some problems remembering events in the recent past. However, we agree with the trial court, especially in light of the fact D.G.'s memory was not wholly deficient, that this was an issue of credibility for the trier of fact. We also agree with the trial court the fact D.G. admitted he lied a lot not only demonstrated his candor and his willingness to tell the truth, but demonstrated that D.G. knew the difference between telling the truth and telling a lie. Accordingly, we find no abuse of discretion in the trial court's determination D.G. was competent to testify.
Appellant's second assignment of error is overruled.
III.
In appellant's third assignment of error, he maintains his due process rights were violated when the prosecutor submitted evidence in violation of his right to remain silent, and then emphasized the same error by attacking his invocation of this right during her closing argument.
We acknowledge the law within the Ohio district courts of appeal is split on the issue of whether pre-arrest, pre-Miranda silence implicates the assurance from the State such silence will not be used punitively in violation of a defendant's Fifth Amendment right against self incrimination. The United States Supreme Court has not addressed whether the use of pre-arrest, pre-Miranda silence by the state as substantive evidence of guilt violates the fifth amendment right against self-incrimination. While numerous federal circuits have considered the issue, they have not agreed.[2] The circuits holding pre-arrest, pre-Miranda silence inadmissible to prove guilt have based their conclusions on the fact the right to remain silent is not derived from Miranda, but from the Fifth Amendment; that the right attaches before *641 the commencement of formal adversary proceedings; and that the right is not limited to persons in custody or charged with a crime. See People v. Welsh (Colo.App.2002), 58 P.3d 1065. The circuits holding otherwise have based their conclusion on the lack of governmental coercion in a pre-arrest setting. Id.
This issue was exhaustively examined in State v. Leach, 150 Ohio App.3d 567, 2002-Ohio-6654, 782 N.E.2d 631. In this extremely thoughtful, thorough, and well-reasoned opinion, the Ohio Sixth District Court of Appeals examined law in Ohio (and in the Federal system.)
The right to remain silent is conferred by the United States and the Ohio Constitutions. The privilege against self-incrimination "is fulfilled only when the person is guaranteed the right 'to remain silent unless he chooses to speak in the unfettered exercise of his own will.' " Miranda v. Arizona, 384 U.S. at 460, 86 S.Ct. 1602, quoting Malloy v. Hogan (1964), 378 U.S. 1, 8, 84 S.Ct. 1489, 12 L.Ed.2d 653. As explained by Justice Marshall in his dissent in Jenkins v. Anderson, "[t]he privilege prohibits the government from imposing upon citizens any duty to present themselves to the authorities and report their own wrongdoing." Jenkins v. Anderson, 447 U.S. 231, 250, 100 S.Ct. 2124, 65 L.Ed.2d 86 (1980) (Marshall, J., dissenting). When the state is allowed to comment on pre-arrest silence, the "accused has effectively lost the right to silence. A 'bell once rung, cannot be unrung.' " See State v. Easter at 238-239, 922 P.2d 1285, quoting State v. Trickel (1976), 16 Wash.App. 18, 30, 553 P.2d 139.
In Combs v. Coyle, 205 F.3d 269, 283 (6th Cir.2000), the Sixth Circuit concluded the "use of a defendant's pre-arrest silence as substantive evidence of guilt violates the Fifth Amendment's privilege against self-incrimination." Such a use "substantially impair[s] the policies behind the privilege," i.e., to prevent the subjection of a suspect to "self-accusation, perjury or contempt," and adds "virtually nothing to the reliability of the criminal process." Id. at 284, 285. The Sixth Circuit explained:
"Because * * * a defendant cannot avoid the introduction of his past silence by refusing to testify, the defendant is under substantial pressure to waive the privilege against self-incrimination either upon first contact with the police or later at trial in order to explain the prior silence. Perhaps more importantly, use of a defendant's prearrest silence as substantive evidence of guilt substantially impairs the 'sense of fair play' underlying the privilege. Unlike the case of impeachment use, the use of defendant's prior silence as substantive evidence of guilt actually lessens the prosecution's burden of proving each element of the crime." Id. at 269.
The fact of silence is of minimal probative value because there are many reasons why a suspect may remain silent. However, another reason to foreclose the use of prearrest silence in the state's case-in-chief is to discourage improper police tactics. To hold otherwise could encourage a delay in reading Miranda warnings so officers could preserve the opportunity to use the defendant's pre-arrest silence as evidence of guilt.[3] Appellant asserts this very argument in his brief.
The Ohio Supreme Court has not explicitly addressed the issue of whether pre-arrest, pre-Miranda silence can be used in the state's case-in-chief. However, in State v. Combs, (1991), 62 Ohio St.3d 278, 581 N.E.2d 1071, the Court determined where a defendant was in custody, and had the right to remain silent, to consult an attorney, *642 and to be given Miranda warnings (but had not been given the warnings), the defendant's invocation of his rights could not be used as substantive evidence of guilt. Id. at 281-282, 581 N.E.2d 1071. Further, a number of Ohio appellate courts have "held that the introduction of the defendant's silence to the authorities during the state's case-in-chief, regardless of whether Miranda warnings were given, is inappropriate in a situation where it is obviously used as nothing but substantive evidence of guilt." See State v. Geboy 145 Ohio App.3d 706, 764 N.E.2d 451 (2001), and cited cases. But, see contra, State v. Margroff (Nov. 21, 1984), 8th Dist. No. 48037, 1984 WL 3622.
In State v. Shea (July 17, 1985), 1st Dist. No. C-840806, 1985 WL 8938, the Hamilton County Court of appeals held the interjection of a defendant's pre-arrest silence in the state's opening statement was error, but nonprejudicial. In Shea, the defendant contacted the police and indicated that the victim's father had accused him of sexually abusing the victim. When the officer began asking questions, the defendant refused to answer. The Court concluded:
"[The] defendant's silence cannot possibly be used to impeach his credibility when he has yet to testify. Mention of defendant's pre-arrest silence at trial is to be used by the state as a 'shield' to prevent the defendant from having the considered opportunity to construct a convenient, and unquestioned, exonerating story. Defendant's pre-arrest silence, in conformity with the rights the Fifth Amendment to the United States Constitution is designed to protect, and should not be used as a 'sword' to provide the initial proof of defendant's guilt." Id. ; Accord, State v. Burke (Sept. 13, 1989), 4th Dist. No. 87 CA 40, 1989 WL 106927.
In Leach, supra, the Sixth District Court of Appeals found the state elicited evidence of the defendant's refusal to speak with police and his failure to keep his appointment and then used such evidence to imply guilt. Therein the defendant Leach clearly invoked his Fifth Amendment privilege against self-incrimination by telling police he wanted to speak to an attorney both before he was arrested and after he was arrested. The Court concluded it was error for the state to attempt to elicit evidence of Leach's request.
However, in State v. Baird (Sept. 17, 1996), Franklin App. No. 96APA03-28, 1996 WL 532289, unreported, the Franklin County Court of Appeals found "[t]he correct analysis focuses not upon muddled notions of 'pre'-arrest versus 'post'-arrest silence, but rather upon whether a criminal defendant's silence occurred before or after his receipt of the Miranda warnings.'' Id., at 128, citing and agreeing with State v. Sabbah (1982), 13 Ohio App.3d 124, 468 N.E.2d 718. In Baird, the court found because the silence was pre-Miranda, there could be no Fifth Amendment protection.
"Generally, a defendant must be advised of his right to remain silent immediately following arrest. Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. However, where Miranda warnings have not been given, "the Supreme Courts of the United States and Ohio have held that there is no government action which induces a defendant to remain silent with an assurance that his silence will not be used against him." State v. Ospina (1992), 81 Ohio App.3d 644, 650, 611 N.E.2d 989." Id., See also State v. Gentry (Nov. 19, 1991), Franklin App. No. 91AP-370, 1991 WL 249518, unreported.
Assuming arguendo we would conclude appellant's pre-arrest silence could not be used against him, we must still *643 determine whether the error warrants reversal.
Appellant contends the prosecutor wrongly commented on appellant's decision not to cooperate with the police by presenting the testimony of Det. Armstrong and in questioning Det. Armstrong is such a way as to elicit the fact appellant had exercised his right to remain silent. At that time, the following exchange took place on the record:
"Q. And did you attempt to contact John Graber in this case?
"A. Yes, I did.
"Q. And what happened when you attempted to contact Mr. Graber?
"A. Ah, couple attempts failed through Diana Ivan. Finally I hooked up with John's mother and we was into a three-way conversation, ah, on the phone.
"Q. Okay. Did you speak at all with the defendant, John Graber, in this case?
"A. On the phone, yes.
"Q. And what was the result of that? What did he say to you?
"A. Ah, he refused to come in and speak with us.
"Q. Okay. And did he tell you why he would not come in and speak with you?
"THE COURT: Just stop. Approach.
"(A conference was held at the bench outside the hearing of the jury.)
"THE COURT: The Court told the prosecutor not to elicit the testimony as to why he did not speak to him.
"And Mr. Dionisio asked if I would give a curative instruction.
"I said I would give one or he can handle it through cross-examination and he chose to go through his own questioning on cross-examination.
"And the purpose for my stopping the questioning was due to the right not to testify or talk to anybody if he didn't want to.
"(End of side bar conference.)
"BY MS. REED: Did you make any further attempt to speak with the defendant?
"A. No. When he indicated he didn't want to come in, that was it.
"Q. Okay. Do you know what happened-what did you do with the case after you attempted to speak with the perpetrator?
"A. The case was then assigned to team review, it's reviewed there and then decided whether to go to grand jury or not."
* * *
"CROSS-EXAMINATION BY MR. DIONISIO: Officer, my client has a constitutional right not to speak with you; is that correct?
"A. That is correct.
"Q. And, and any inference that may have been suggested that he was unwilling to talk to you, ah, would have no implication as far as his guilt or innocence in this case; is that correct?
"MS. REED: Objection, Your Honor.
"THE COURT: I'll allow the question.
"Are you asking for a legal conclusion? That's my only concern.
"MR. DIONISIO: Your Honor, I'll leave it at the fact that the officer just indicated he has no obligation to speak, with him.
* * *
"MR. DIONISIO: Can we approach, Your Honor?
"THE COURT: Yes.
"(A conference was held at the bench outside the hearing of the jury.)
"(End of side bar conference.)
*644 "THE COURT: Ladies and gentlemen, testimony was elicited from Detective Armstrong that he made contact with Mr. Graber and that he, ah, asked him the question and that he, Mr. Graber, the defendant, decided, made a decision not to speak to the detective.
"And I will tell you that each person has a constitutional right not to speak to a police officer if they so choose. And no inference is to be drawn at all from whether they do or they do not speak to the detective. It's a constitutional right, he invoked it and you are to draw no inference whatsoever from that."
Tr. at 158-160.
Appellant also contends the prosecutor again violated his Fifth Amendment right during closing argument, wherein she stated: "Det. Armstrong; he told you he attempted to contact the defendant and he told you the defendant would not speak." Tr. at 483.
With regard to the testimony of Det. Armstrong, appellant did not immediately object. However, the trial court did stop the testimony, and after conference with the parties, appellant's trial counsel asked to be permitted to cross-examine Det. Armstrong on the issue of self-incrimination. After this cross examination, the trial court issued a curative instruction. Even if it was error to admit this testimony, we would analyze such error under a plain error of standard.
Crim. R. 52(B) provides:
"[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." By its very terms, the rule places three limitations on a reviewing court's decision to correct an error despite the absence of a timely objection at trial. First, there must be an error, i.e., a deviation from a legal rule. State v. Hill (2001), 92 Ohio St.3d 191, 200, 749 N.E.2d 274, 283 (observing that the "first condition to be met in noticing plain error is that there must be error"), citing United States v. Olano (1993), 507 U.S. 725, 732, 113 S.Ct. 1770, 1776, 123 L.Ed.2d 508, 518 (interpreting Crim.R. 52 [B]'s identical federal counterpart, Fed.R.Crim.P. 52 [b] ). Second, the error must be plain. To be "plain" within the meaning of Crim.R. 52(B), an error must be an "obvious" defect in the trial proceedings. State v. Sanders (2001), 92 Ohio St.3d 245, 257, 750 N.E.2d 90, 111, citing State v. Keith (1997), 79 Ohio St.3d 514, 518, 684 N.E.2d 47, 54 ; see, also, Olano, 507 U.S. at 734, 113 S.Ct. at 1777, 123 L.Ed.2d at 519 (a plain error under Fed.R. Crim.P. 52 [b] is " 'clear' or, equivalently, 'obvious' " under current law). Third, the error must have affected "substantial rights." The Supreme Court has interpreted this aspect of the rule to mean that the trial court's error must have affected the outcome of the trial. See, e.g., Hill, 92 Ohio St.3d at 205, 749 N.E.2d at 286 ; State v. Moreland (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899 ; State v. Long (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.
Even if a forfeited error satisfies these three prongs, however, Crim.R. 52(B) does not demand an appellate court correct it. Crim.R. 52(B) states only that a reviewing court "may" notice plain forfeited errors; a court is not obliged to correct them. Supreme Court has acknowledged the discretionary aspect of Crim.R. 52(B) by admonishing courts to notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." State v. Long, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph three of the syllabus; see, also, Olano, 507 U.S. at 736, 113 S.Ct. at 1779, 123 L.Ed.2d at 521 (suggesting *645 that appellate courts correct a plain error "if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings,' " quoting United States v. Atkinson [1936], 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557 ).
We decline to find plain error where appellant failed to timely object, was afforded the opportunity to cross-examine the witness, and was afforded a curative instruction. This portion of appellant's third assignment of error is overruled.
Appellant also asserts the statement made by the prosecutor during closing argument amounted to prosecutorial misconduct as it again attacked appellant's right to remain silent. However, because the general jury instructions informed the jury closing arguments do not contain evidence, and in light of the previous curative instruction given during Det. Armstrong's testimony, we find no prejudice. Therefore, this portion of appellant's third assignment of error is overruled.
At this juncture, we note appellant tacks on a number of other statements he claims to be prosecutorial misconduct. However, because these errors were not separately assigned, pursuant to App. R. 12 and 16, we decline to review them.
Appellant's third assignment of error is overruled.
IV.
In appellant's fourth assignment of error, he claims the trial court committed error by prohibiting him from introducing evidence of J.G.'s 1995 allegation appellant had sexually abused her. We disagree.
In 1995, the mother reported to DHS that her daughter claimed appellant had sexually abused her. DHS did an investigation after which it found the claim "unsubstantiated." The State of Ohio did not pursue a prosecution against appellant.
R.C. 2907.02(D)(E) codifies Ohio's "rape shield" law. The statute renders inadmissable prior sexual conduct of a victim or a defendant and states, in relevant part:
"(D) Evidence of specific instances of the victim's sexual activity, opinion evidence of the victim's sexual activity, and reputation evidence of the victim's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value. Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, the defendant's past sexual activity with the victim, or is admissible against the defendant under section 2945.59 of the Revised Code, and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value.
"(E) Prior to taking testimony or receiving evidence of any sexual activity of the victim or the defendant in a proceeding under this section, the court shall resolve the admissibility of the proposed evidence in a hearing in chambers, which shall be held at or before preliminary hearing and not less than three days before trial, or for good cause shown during the trial."
In State v. Boggs (1992), 63 Ohio St.3d 418, 588 N.E.2d 813, para. 2 of the syllabus, the Ohio Supreme Court created an *646 exception to the rape shield rule, holding when an alleged rape victim admits to having made a prior false rape allegation, there should be an in-camera inspection to determine whether the allegation was totally unfounded. If so, then the evidence would be admissible.
The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v. Sage (1987), 31 Ohio St.3d 173, 510 N.E.2d 343. Therefore, we will not disturb a trial court's evidentiary ruling unless we find said ruling to be an abuse of discretion; i.e. unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. State v. Adams (1980), 62 Ohio St.2d 151, 157, 404 N.E.2d 144.
In the matter sub judice, the trial court conducted a hearing a week before trial to determine the admissibility of the previous charge. After conducting an in-camera inspection of the records during which appellant's trial counsel was permitted to review the file, the trial court found it could not determine why the initial report came back as "unsubstantiated." November 29, 2001 Hearing at 3. Further, the trial court noted it could only find statements of the mother, of appellant, and of the children. The trial court ordered the parties to brief the issues and to return for a hearing on December 5, 2001. In reliance upon State v. Boggs, supra, and State v. Netherland (1999), 132 Ohio App.3d 252, 724 N.E.2d 1182, the trial court found unless the prior allegation was absolutely false, the rape shield law prevented the evidence from being introduced, and further prevented the cross-examination of the mother about prior allegations of sexual misconduct.[4] Tr. at 56.
On the morning of trial, the trial court noted the claims arose when J.G. made a statement to her grandmother, the grandmother told the mother, and the mother reported the allegation to DHS. The DHS had a physical exam of J.G. completed, and the file came back as unsubstantiated. The trial court noted J.G. made statements to the social worker alleging the incident occurred, and the physical exam revealed some irritation to her vaginal area. At no time did J.G. recant. Under these facts, we cannot find the trial court erred in prohibiting a cross examination of the mother on this issue. Because the evidence would have gone to J.G.'s sexual history, R.C. 2907.02(D) excluded the evidence, absent some demonstration the prior allegation was not completely unfounded. In light of these facts, we cannot find the trial court abused its discretion in excluding this testimony.
Accordingly, appellant's fourth assignment of error is overruled.
V.
In appellant's fifth assignment of error, he maintains he was denied the effective assistance of trial counsel. We disagree.
The standard of review of an ineffective assistance of counsel claim is well-established. Pursuant to Strickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693, in order to prevail on such a claim, the appellant must demonstrate both (1) deficient performance, and (2) resulting prejudice, i.e., errors on the part of counsel of a nature so serious that there exists a reasonable probability that, in the absence of those errors, the result of the trial court would have been different. State v. Bradley (1989), 42 Ohio St.3d 136, 538 N.E.2d 373 ; State v. Combs, supra.
In determining whether counsel's representation fell below an objective *647 standard of reasonableness, judicial scrutiny of counsel's performance must be highly deferential. Bradley, 42 Ohio St.3d at 142, 538 N.E.2d 373. Because of the difficulties inherent in determining whether effective assistance of counsel was rendered in any given case, a strong presumption exists that counsel's conduct fell within the wide range of reasonable, professional assistance. Id.
In order to warrant a reversal, the appellant must additionally show he was prejudiced by counsel's ineffectiveness. This requires a showing that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. Bradley, supra at syllabus paragraph three. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id.
After reviewing appellant's assignment of error, it appears appellant sets forth six areas in which he claims his trial counsel was ineffective. Appellant claims his trial counsel failed to object at key points, failed to cross examine D.G. on the issue of credibility, failed to move for a mistrial because of prosecutorial misconduct, failed to move for a mistrial for Doyle violations, and failure to ask for a curative instruction for such Doyle violations, failed to move for a mistrial with regarded to the prosecutor's statement appellant was a "perpetrator", and failed to inform the jury one of the victims was an admitted liar. We will address each of appellant's contentions in turn.
First, appellant claims his trial counsel failed to object during the prosecutor's opening statement when she stated defendant had taken away the "innocence of D.G. and J.G." Appellant claims this same remark was repeated without objection in the closing argument. We do not find this comment improper. Accordingly, this portion of appellant's fifth assignment of error is overruled.
Appellant next claims his trial counsel failed to examine D.G. with reference to his credibility despite the fact D.G. admitted he "lies a lot." Appellant further maintains his trial counsel failed to mention the fact D.G. lied a lot to the jury in opening statement, failed to question D.G. about the matter on cross examination during trial, and therefore was unable to argue the fact D.G. was a liar during his closing argument. Appellant also claims his trial counsel failed to object to the prosecutor's questions about D.G. testifying to the truthfulness of individual, irrelevant facts. In so doing, appellant claimed the prosecutor was vouching for the credibility of D.G. and J.G.
We note appellant has failed to reference any specific portion of the record to demonstrate this error. Notwithstanding this fact, we have reviewed the entire record and find no error with regard to any potential failure to object. In fact, after reading appellant's trial counsel's cross examination of D.G., we find it was effective. It clearly demonstrated D.G.'s lack of memory, and highlighted the fact D.G. failed to tell a number of trusted people about his father's conduct, even when presented with the opportunity to share the information privately. We further find the cross-examination was effective in that it impeached D.G.'s credibility without running the risk of alienating the jury. As set forth in our analysis of appellant's second assignment, we find it was a sound trial strategy not to examine D.G. on his propensity to lie. In light of the testimony D.G. had just given, detailing the abuse he suffered, we find it was sound trial strategy to choose to impeach D.G.'s credibility on issues of memory and his decision not to tell trusted family members about the *648 abuse, as opposed to attacking him as a liar. To do so would have risked evoking sympathy for the victim, thereby alienating the jury. Accordingly, this portion of appellant's assignment of error is overruled.
Appellant also asserts his trial counsel was ineffective in failing to move for a mistrial based upon prosecutorial misconduct. Again, appellant does not specify what prosecutorial misconduct this argument is based upon, and for that reason alone, we could decline to address the issue. However, in light of the fact that we found no prosecutorial misconduct in the statements previously advanced in appellant's brief, we cannot find appellant's trial counsel was ineffective in failing to move for a mistrial based upon such statements.
Next, appellant contends his trial counsel was ineffective in failing to move for a mistrial on the basis of the prosecutor's improper use of his right to remain silent. However, as discussed above, because appellant received a curative instruction, we can find no prejudice from his trial counsel's failure to object and/or move for a mistrial on this basis.
Further, appellant contends his trial counsel was ineffective in failing to move for a mistrial because the prosecutor at one point referred to him as "a perpetrator." We agree with appellant this was an improper comment, but our review of the record indicates it was an isolated reference. While appellant's trial counsel should have objected, we can find no reasonable probability the outcome of the trial would be different had such an objection taken place.
Finally, appellant claims his trial counsel was ineffective in failing to argue during closing argument that D.G. was an admitted liar. For the same reasons set forth above, we disagree appellant's trial counsel was ineffective for this reason.
Appellant's fifth assignment of error is overruled.
VI.
In appellant's sixth assignment of error, he maintains it was error to admit the medical records of J.G. and D.G. which included unredacted hearsay statements. Appellant contends these prejudicial statements were introduced in violation of Evid. R. 807. Although the record is not clear where or when, it is clear the trial court and counsel redacted various parts of the medical records. On page 372 of the trial transcript, the trial court admitted the medical records without objection from the defense. However, the trial court permitted both sides to go through the medical records and clip those parts of the records to which they objected. The trial court stated it would rule on those objections after the parties marked the records. On page 506 of the transcript, there is a statement that the exhibits were taken back to the jury room at 12:25 p.m., approximately one hour after jury deliberations had begun. No other objections were lodged on the record relative to the introduction of these exhibits. Accordingly, we review this assignment under the plain error standard.
While we agree with appellant some of the statements contained in the medical records were irrelevant and potentially prejudicial, we cannot find the admission of such statements rose to the level of plain error. After reviewing the testimony of the children detailing how and when their father abused them, we cannot find the statements contained within the medical records could sway the jury into creating a manifest injustice.
Accordingly, appellant's sixth assignment of error is overruled.
*649 VII.
In appellant's seventh assignment of error, he maintains the cumulative effect of his first through six assignments of error resulted in denial of his right to a fair trial. We disagree.
We have reviewed each of these assignments of error and will not re-address them here. Further, in light of the fact that we have found no error thus far, we do not find the cumulative effect of no error can amount to the denial of the right to a fair trial.
Appellant's seventh assignment of error is overruled.
VIII.
In appellant's eighth assignment of error, he maintains the trial court erred in imposing maximum, consecutive sentences on the rape charges where the trial court failed to list the factors contained in R.C. 2929.14(C), and imposing consecutive sentences pursuant to R.C. 2929.14(E)(4). We agree in part.
The imposition of a maximum sentence is governed by R.C. 2929.14(C). The statute states, in relevant part:
"(C) Except as provided in division (G) of this section or in Chapter 2925. of the Revised Code, the court imposing a sentence upon an offender for a felony may impose the longest prison term authorized for the offense pursuant to division (A) of this section only upon offenders who committed the worst forms of the offense, upon offenders who pose the greatest likelihood of committing future crimes, upon certain major drug offenders under division (D)(3) of this section, and upon certain repeat violent offenders in accordance with division (D)(2) of this section."
The imposition of consecutive sentences is governed by R.C. 2929.14(E). The statute states, in relevant part:
"(4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
"(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
"(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
"(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender."
R.C. 2929.19, the statute which governs the sentencing hearing, also requires the trial court state its reasons to support the finding(s) used to justify the imposition of a maximum or consecutive sentences. These "reasons" are an additional element to the "findings" requirement of R.C. 2929.14(C). State v. Edmonson (1999), 86 Ohio St.3d 324, 715 N.E.2d 131.
With this authority in mind, we turn our attention to the record before us.
*650 At the sentencing hearing, the following exchange took place on the record:
"THE COURT: The two sentences in regard to J.G. are sexual offenses and, therefore, under 2929.14 the Court finds that the shortest prison term would demean the seriousness of the Defendant's conduct and not adequately protect the public from future crimes.
"The children during the time in which these allegations were committed were when the children were of the most tender age, two and four years old through I believe when they were six and seven years old.
"Secondly, as far as J.G. goes, this was approximately a three-year continuing course of conduct. I believe for D.G. it was a two-year course of conduct. In addition to the acts which were detailed in the State's presentation of the case, there was also acts of physical violence perpetrated by this Defendant against those children.
"The relationship between you, Mr. Graber, and your children is, of course, the most sacred of relationship between any two humans. In this Court's opinion to give you the shortest term of prison available would certainly demean the course of your conduct. Also, the acts you committed on them and the relationship of their biological father to them, by giving you the shortest range would demean that conduct, but more importantly, it would not adequately protect the public from other people such as yourself who would make a decision to prey on young children.
"So the Court finds to give you the shortest prison term would not adequately protect the public. The Court further finds under 2929.14 (C) the Defendant committed the two worst forms of the offense.
"I don't believe that there is any question but that you committed the most serious and most worst form of this particular offense.
"The next issue is whether or not the Court is justified in sentencing you to the shortest or longer range in the classification. Under 2929.14 (C) I am (untranslated steno) would in a sense say that a father is permitted to rape all of his children for as long as he wishes under any condition he chooses and only be punished for one general rape. I find that type of logic to be inappropriate.
"To be honest with you, Mr. Graber, I am getting tired of sentencing fathers and mothers who perpetrate offenses against the most defenseless persons of our society. And for you to commit these acts on each of those children separately for this period of time leaves me no alternative.
"Your time to ask for mercy may have been about 15, 10 years ago when you realized the conduct you were engaged in was totally unacceptable and yet you made a conscious decision to perpetrate that kind of conduct. You made a conscious decision to ruin your young children. They will not forget what you did. Make no bones about it. They will remember what you've done for years to come and they're going to have to deal with this.
"Therefore, based upon the guidelines the Court has indicated, in Count One, rape with regards to J.G., the Court will order that you serve a period of ten years in the appropriate state institution.
"In regards to Count Three, gross sexual imposition, I will merge with Count One and order you to serve a period of five years in the appropriate state institution, but I will run that concurrently with Count One.
"In regards to Count Two, rape, I'll order you to serve a period of ten years in the appropriate state institution. I'll run Count Four, gross sexual imposition, as *651 merged and order you to serve five years concurrent with Count Two.
"The ten years is based on the age of the children, the type of facts presented and based upon the guidelines (untranslated steno).
"Mr. Dionisio, is there any evidence you wish to submit at this time?
"MR. DIONISIO: No, Your Honor.
"THE COURT: State of Ohio?
"MS. REED: Your Honor, the State has nothing further to add.
"THE COURT: I think there were victim impact statements, but the Court did not review those prior to trial, therefore, in reviewing the following (untranslated steno). This Defendant is the biological father of the children and in fact I'm not sure what his age is at this time.
"MR. DIONISIO: Thirty-seven.
"THE COURT: If you went back to 1996, he'd be in his 30s. The Court understands he has no prior criminal record. The age of the victims were tender years, three and four years old, a little older. (Untranslated steno.) About his own children. There was no evidence at all that he sought any type of counseling whatsoever. There is no evidence that Mr. Graber suffers from any mental illness or disability.
"And I find it certainly was a demonstrated pattern of abuse with multiple victims. I also find that he displayed and/or threatened cruelty in regards to these acts and the Court finds there was no other evidence to mitigate any of the findings the Court has found." Tr. at 528-533.
Further, in its December 13, 2001 Judgment Entry, the trial court stated the following:
"The Court finds pursuant to Revised Code Section 2929.14(B) that the shortest prison term will demean the seriousness of the defendant's conduct and the shortest prison term will not adequately protect the public for future crime by the defendant or others.
"Pursuant to Revised Code Section 2929.14(E), the Court finds for the reasons stated on the record that consecutive sentences are necessary to protect the public from future crime or to punish the defendant and not disproportionate to the seriousness of the defendant's conduct and the danger the defendant poses to the public.
"Therefore, the sentences are to be served consecutively.
"The Court also finds that a maximum basic prison term is inadequate to protect the public because one or more applicable factors under Revised Code Section 2929.12 indicating a defendant is more likely to commit future crimes outweigh any applicable factors indicating that a defendant is less likely to commit future crimes."
The trial court made the requisite findings for the imposition of greater than the minimum term pursuant to R.C. 2929.14(B), and the court's decision to impose the maximum prison term for each rape count pursuant to R.C. 2929.14(C) was also supported by the appropriate findings and reasons. While the trial court made the requisite findings under R.C. 2929.14(E)(4), it did not make the additional finding required in R.C. 2929.14(E)(4)(a)(b) or (c), and therefore, also failed to state all of the required reasons for the imposition of a consecutive sentence. We note the reasons stated by the trial court in support of the maximum sentences would have supported a finding of consecutive sentences pursuant to R.C. 2929.14(E)(4)(b), however the trial court was required to make such findings before imposing consecutive sentences. Accordingly, this portion of appellant's eighth assignment of error is sustained.
*652 The December 13, 2001 Judgment Entry of the Stark County Court of Common Pleas is affirmed in part as to appellant's convictions but reversed in part as to appellant's sentence. This matter is remanded to the trial court for resentencing.
Farmer, J. and
Edwards, J., concur

Appellant's brief quotes in the transcript only up to this point.

State v. Leach, 150 Ohio App.3d 567, 2002-Ohio-6654, 782 N.E.2d 631, par. 33, citing Strauss, 35 Loy.LAL.Rev. at 130-137 (the First, Sixth, Seventh, and Tenth Circuits hold that the introduction of pre-arrest, pre-Miranda silence violates the Fifth Amendment, and the Fifth, Ninth, and Eleventh Circuits hold otherwise).

See State v. Easter, 130 Wash.2d 228, 239, 922 P.2d 1285 (1996).

Defense counsel wanted to cross examine the mother, not the child.