[Cite as *State v. Hill*, 2018-Ohio-3130.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                    :        APPEAL NO. C-170507
                                           TRIAL NO. B-1700427
    Plaintiff-Appellee,      :

 vs.                              :
                                           *O P I N I O N.*
MARK HILL,                        :

    Defendant-Appellant.     :


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  August 8, 2018


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Scott M. Heenan*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*The Law Office of John D. Hill, LLC,* and *John D. Hill, Jr.*, for Defendant-Appellant.

**ZAYAS, Judge.**

{¶1}   Defendant-appellant Mark Hill was charged with burglary in violation of R.C. 2911.12(A)(2) for entering a residence on Flora Street in the Clifton Heights area and stealing a flat screen television ("TV") and gaming headphones from Mitch Mrus.  Following a bench trial, the trial court found Hill guilty and sentenced him to 48 months in prison for the burglary.

{¶2}   In this appeal, Hill challenges his conviction on the basis of the sufficiency and manifest weight of the evidence, the denial of his motion to suppress, the admissibility of police body camera videos, the ineffectiveness of trial counsel, and the cumulative effect of the errors on his right to a fair trial.  We find no merit to Hill's arguments and affirm the judgment of the trial court.

### The Body Camera Videos

{¶3}   On January 27, 2017, Cincinnati Police Officer John Neal was dispatched to Emming Street to investigate a report of a brick thrown at a house.  He took a statement from the complainants for criminal damaging.  While Neal was investigating on Emming Street, Officers Stavale and Pierson responded independently to Coon Alley to investigate a possible suspect.

{¶4}   When Stavale arrived, Hill was being detained by Officer Bricker.  Hill identified himself and stated that he was waiting for his girlfriend to get off of work.  Hill began to volunteer personal information.  Bricker had placed Hill in handcuffs and informed him that he was being detained.  Bricker and Stavale asked him routine questions such as his name, address, social security number, and telephone number.  Bricker conducted a pat down, and found a power cord in Hill's pocket.  Bricker retrieved Hill's identification card, and Stavale took it to his cruiser to run it while Pierson, who had arrived after Stavale, remained with Hill.

2

{¶5} As Bricker walked away, Hill inexplicably exclaimed, "Hey, it's over there, bro." Moments later, Bricker found a flat screen TV and gaming headphones behind the car where he first saw Hill. Pierson placed Hill in Stavale's cruiser, told him that he was being detained while the officers continued to investigate, and placed the TV in the trunk of Stavale's cruiser.

{¶6} While in the cruiser, Hill continued to make numerous, unprompted, statements to the officers. He told them that the TV was not stolen, and that it was given to him in exchange for drugs. Hill repeatedly told the officers that a friend gave him the TV, that he did not steal it, and that he did not break into any house. He further explained that he had been drinking beer with a friend and left to purchase drugs for that friend. When Hill returned with the drugs, the friend gave him the TV to pay for the drugs.

{¶7} In the meantime, Stavale finished running Hill's identification and told Pierson that Hill had an extensive history of burglaries.

{¶8} Neal arrived on the scene with the Emming Street complainants in his cruiser. Neal brought them to see if they could identify Hill as the person who threw the brick at their home. Initially, Hill refused to look toward Neal's cruiser, knocked Neal's camera to the ground, told him that he could not make him do anything, and demanded the officer call his lawyer. Hill started cursing but finally turned toward the cruiser.

{¶9} Hill was returned to Stavale's cruiser and continued to explain the circumstances to Stavale and Pierson. He claimed that he had been sitting outside with his friend for four hours drinking. He stated that "Red" pulled up with the dope, and he gave his friend the dope. Hill asked the officer to get both sides of the story.

3

{¶10} After the complainants identified Hill as the man who threw the brick, he was placed under arrest for criminal damaging.

**The Motion to Suppress**

{¶11} Hill filed a motion to suppress his statements alleging that he was not advised of his rights before he was interrogated.

{¶12} At the hearing, Sergeant Vaughn testified that he was a Cincinnati police officer, but was working that night as a supervisor for the University of Cincinnati robbery prevention detail. Vaughn was not wearing a body camera because he was not required to wear one while working a detail.

{¶13} When Vaughn arrived, he saw Hill being detained by Bricker and placed into Stavale's cruiser. Vaughn did not see Hill again until Stavale transported him to Flora Street after the owner of the TV, Mitch Mrus, was located. Vaughn reached into the driver's side window of the cruiser, retrieved Stavale's written *Miranda* warnings, rolled down the rear passenger window, and read the *Miranda* rights to Hill. Vaughn did not have Hill sign a written *Miranda* waiver.

{¶14} Vaughn testified that they had a five minute conversation. Hill explained that he had obtained drugs for Mrus that evening. When he returned to Mrus's home with the drugs, Mrus gave him permission to take the TV to pay for the drugs. Vaughn further testified that Hill never requested an attorney.

{¶15} Hill testified that he did not make any statements to Vaughn that evening, and that Vaughn did not read him his rights while they were in Clifton Heights. Hill testified that he was not read his rights until the officers had driven him downtown and parked the car. Then, Vaughn informed him he was under arrest for burglary and read him his rights. Hill did not speak to Vaughn after he was *Mirandized.* Hill admitted that he had made numerous statements to Pierson,

4

Stavale, and Bricker.

{¶16} At the end of the hearing, Hill submitted the body camera videos from Neal, Stavale, and Pierson as a joint exhibit. After reviewing the videos, the trial court denied the motion to suppress.

### The Trial Testimony

{¶17} Mrus testified that he lived on Flora Street in a three-story home with five other college students. On January 22, 2017, he had returned home from a party, intoxicated, and was sitting on his front porch drinking beer. Hill approached him, and they spoke for 20 to 30 minutes. Mrus testified that they may have had a beer together, but he could not remember. He offered to buy Hill a pack of cigarettes, so they walked down the street to the store after 1:30 a.m. When they discovered the store was closed, Mrus left to go to his friend's house down the street. He did not see where Hill went.

{¶18} Mrus testified that his TV, Play Station, and headphones were in his house before he went to his friend's home. When he returned home between 2:30 a.m. and 3:00 a.m., he saw his TV and his Play Station in the front yard, and his roommates and several police officers in front of his house. No other property was missing.

{¶19} Mrus denied purchasing drugs from Hill, and testified that he did not give Hill permission to enter his home or take his TV.

{¶20} Bricker testified that he saw Hill on Coon Alley, a few blocks from Emming Street, standing on a driveway between a garage and a parked car. Hill appeared to be hiding, so when Hill walked away from the car, Bricker stopped him further up the street. After Pierson arrived, Bricker walked up the driveway where he initially saw Hill and found a flat screen TV.

5

{¶21} Bricker stated that he canvassed the area with Vaughn looking for any signs of a forced entry. They located a house that was missing a TV on Flora Street. After they found the home, Bricker had no further interactions with Hill.

{¶22} Vaughn testified that when he arrived, Hill was being searched by Bricker. Bricker removed a power cord from Hill's pocket. Later, they determined that the power cord was for the TV they found by the car.

{¶23} After Bricker found the TV, he and Vaughn searched the area to determine where Hill got the TV. When they walked down Flora Street, the residents of 2244 Flora came outside to speak with them. After the officers learned that a TV had been stolen from the home, Stavale drove Hill and the TV to Flora Street. When Mrus came home, he recognized the TV and informed Vaughn that the flat screen TV belonged to him.

{¶24} During this time, Hill was sitting in the back of Stavale's cruiser. Vaughn approached the car, *Mirandized* Hill, and spoke with him. Hill told him that he knew Mrus, and that Mrus had owed him money for drugs. Mrus had given him the TV to pay the dealer for the drugs. After Vaughn's testimony, the state rested.

{¶25} Hill's motion for an acquittal was denied by the trial court, and Hill testified on his own behalf. Hill stated that he was in Clifton Heights to meet a friend, and he went to the store to buy a beer. While he was walking up Ravine Street, Mrus stopped him and asked for directions because his friend was lost. Mrus invited him to have a beer, and when Hill declined, Mrus begged him to have drinks. Hill finally agreed, and they sat outside Mrus's home drinking ginger ale beers for three to four hours. Mrus went into the house several times to retrieve the beers.

{¶26} They walked to the store because Mrus wanted to buy chewing tobacco. When they arrived at the store, Mrus discovered that he had lost his money,

so they want back to the house to drink. After drinking four or five beers, Mrus wanted to purchase some marijuana.

{¶27} Hill offered to get him cocaine from his friend Red who lived on Stratford. Mrus agreed, so Hill left and walked to get the cocaine. He purchased $90 worth of cocaine, and on his way back, he got into an argument with some white men. He threw a brick at a window where he thought one of the white men lived. Hill returned to Mrus's house with the drugs.

{¶28} Mrus offered to give him his 42-inch flat screen TV to pay for the drugs. Hill entered the home and helped Mrus carry the TV outside. Then, the two parted ways.

{¶29} On cross-examination, Hill admitted that he had been convicted of four felonies in the past ten years, and had been incarcerated for more than one year on each. He further testified that both Mrus and Vaughn were lying.

{¶30} Hill entered the CD with three body camera videos into evidence as his only exhibit. After confirming the court had reviewed all three videos, the defense rested.

{¶31} In finding Hill guilty, the trial court stated that his story was not believable. The court sentenced him to 48 months' incarceration.

## Manifest Weight of the Evidence

{¶32} In his first assignment of error, Hill argues that his burglary conviction is not supported by the manifest weight of the evidence. Specifically, Hill argues that his testimony more credible than Mrus's testimony.

{¶33} When reviewing a claim that a conviction is against the manifest weight of the evidence, the court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and

determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created a manifest miscarriage of justice. *State v. Smith*, 2017-Ohio-8558, 99 N.E.3d 1230, ¶ 60 (1st Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). "Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." *State v. McNeil*, 2d Dist. Clark No. 2017-CA-64, 2018-Ohio-2659, ¶ 39, citing *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997).

{¶34} Although Hill and Mrus testified to two entirely different versions of events, the trial court believed Mrus's testimony and discounted Hill's testimony. In rendering the verdict, the trial court admonished Hill for concocting such a ridiculous story. Based on our review of the record, we cannot say that the court clearly lost its way and created such a manifest miscarriage of justice that we must reverse Hill's conviction and order a new trial. Accordingly, we overrule his first assignment of error.

## Sufficiency of the Evidence

{¶35} In his second assignment of error, Hill alleges that the state introduced insufficient evidence to convict him of burglary because there was no evidence that anyone was home or likely to be home when the TV was stolen. He further argues that Mrus and his roommates were all University of Cincinnati college students who were likely to be out partying on a Saturday night between 1:30 a.m. and 2:00 a.m. when the burglary occurred.

{¶36} When reviewing the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offenses

8

proved beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶37} R.C. 2911.12(A)(2) provides, in relevant part, that no person shall "[t]respass in an occupied structure * * * that is a permanent or temporary habitation of any person when any person other than an accomplice of the offender is present or likely to be present, with purpose to commit in the habitation any criminal offense * * *."

{¶38} In determining whether persons were present or likely to be present, a defendant's knowledge or belief is not relevant. *In re Meatchem*, 1st Dist. Hamilton No. C-050291, 2006-Ohio-4128, ¶ 16. "The issue is not whether the burglar subjectively believed that persons were likely to be there, but whether it was objectively likely. The significant inquiry is the 'probability or improbability of actual occupancy which in fact exists at the time of the offense, determined by all the facts surrounding the occupancy.' " *State v. Cravens*, 1st Dist. Hamilton No. C-980526, 1999 WL 567098, * 1 (June 25, 1999), quoting *State v. Durham*, 49 Ohio App.2d 231, 229, 360 N.E.2d 743 (1st Dist.1976).

{¶39} Merely showing that people lived in the home is insufficient; the state must adduce specific evidence that people were present or likely to be present at the time of the burglary. *Cravens* at *1. *See State v. Fowler*, 4 Ohio St.3d 16, 18-19, 445 N.E.2d 1119 (1983). Where the state proves that a home is regularly inhabited, the occupying residents were in and out on the day in question, and the house was burglarized when the residents were temporarily absent, the state has presented sufficient evidence to prove the likely to be present element. *State v. Kilby*, 50 Ohio St.2d 21, 362 N.E.2d 1336, (1977), paragraph one of the syllabus. Courts have found insufficient evidence when the occupants were absent for an extended period of time

on vacation or gone for the entire work day when the house was burglarized during the work day. *State v. Frock*, 2d Dist. Clark No. 2004 CA 76, 2006-Ohio-1254, ¶ 21.

{¶40} Here, the burglary occurred sometime after 1:30 a.m. and before 2:30 a.m. The evidence showed that Mrus lived in the three-story home with five roommates. That evening, Mrus had returned home from a party at 11:30 p.m. and sat on his front porch drinking beer. During that time, he went in and out of the house to get more beer. Mrus left his home to go to the store after 1:30 a.m. and then visited a friend for approximately an hour. At the time he left, Mrus testified that his TV, play station, and headphones were still in his home.

{¶41} When he returned home between 2:30 a.m. and 3:00 a.m., all of his roommates were in front of the house. According to Vaughn, all of the roommates came out of the house to report that the TV was missing when they saw the officers canvassing the area.

{¶42} From the evidence presented, the fact finder could conclude that someone was likely to be present at the time of the offense. Mrus and his five roommates were college students who shared the home, Mrus had been in and out of the house that evening and was temporarily absent at the time of the burglary, the roommates came out of the home to flag down the officers, and the offense occurred between 1:30 a.m. and 2:30 a.m. when the residents were likely to be sleeping. The state provided sufficient evidence that someone was likely to be present at the time of the burglary. *See Kilby* at paragraph one of the syllabus. We overrule the second assignment of error.

### Statements Made by Hill

{¶43} In the third assignment of error, Hill argues that his statements to the police officers should have been suppressed because he was in custody and was

questioned without being given *Miranda* warnings.

{¶44}     Our review of a trial court's ruling on a motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. We must accept the trial court's findings of fact if they are supported by competent and credible evidence, rely on the trial court's ability to assess the credibility of the witnesses, and determine whether the trial court applied the proper legal standard to the facts. *State v. Baker*, 4th Dist. Washington No. 16CA30, 2018-Ohio-762, ¶ 7.

{¶45} Statements made during custodial interrogation are inadmissible unless the police have given the accused a *Miranda* warning before the interrogation. *Miranda v. Arizona*, 384 U.S. 436, 471, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A custodial interrogation occurs when a person has been taken into custody or deprived of his freedom, and a law enforcement officer questions that person. *Id.* at 476. " 'Interrogation' includes express questioning as well as 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.' " *State v. Strozier*, 172 Ohio App.3d 780, 2007-Ohio-4575, 876 N.E.2d 1304, ¶ 20 (2d Dist.), quoting *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

{¶46} A suspect who voluntarily gives information without being asked questions is not subject to a custodial interrogation and is not entitled to *Miranda* warnings. *State v. McGuire*, 80 Ohio St.3d 390, 401, 686 N.E.2d 1112 (1997), citing *State v. Roe*, 41 Ohio St.3d 18, 22, 535 N.E.2d 1351 (1989).

{¶47} A review of the body camera videos shows that Hill was in the custody of law enforcement officers when the statements were made. Bricker placed Hill in

handcuffs and told him he was being detained. Both Stavale and Bricker obtained basic identifying information from him. As Bricker was walking away, Hill exclaimed, "Hey, it's over there, bro." Moments later, Bricker found the TV behind the car where he first saw Hill. After Bricker found the TV, Hill was placed in the back of the cruiser. Hill was not read his *Miranda* rights at that time.

{¶48} While in the cruiser, Hill continued to make numerous unprompted statements. Hill told the officers that the TV was not stolen and offered to take the officers to the guy who gave it to him. He further claimed that the TV was given to him in exchange for dope. Throughout the videos, Hill can be heard repeatedly telling the officers that he did not steal the TV, and that he obtained it as payment for drugs.

{¶49} Hill's incriminating statements were not the product of custodial interrogation; rather the statements were voluntary and spontaneous. Because the statements were freely made, and not the result of custodial interrogation, Hill was not entitled to *Miranda* warnings. *See McGuire* at 401. Accordingly, the trial court did not err in finding that the statements were admissible.

{¶50} Hill also argues that any statements he made to Vaughn flowed from the previous interrogation and should have been suppressed. Because Hill was not subject to custodial interrogation, any statements he made to Vaughn after he was properly advised of and waived his *Miranda* rights were admissible. *See State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 24.

{¶51} Hill further claims that the trial court erred in believing Vaughn's testimony that he administered the *Miranda* warnings to Hill prior to questioning him.

{¶52} Here, the trial court determined that Vaughn's testimony was more

believable than Hill's.  Because issues of credibility are primarily for the trial court to decide, and the record lacks any indication that Vaughn's testimony was not credible, we find no reason to disturb the trial court's finding that Vaughn was a more credible witness.  We overrule his third assignment of error.

### Other Acts Evidence

{¶53} Next, Hill contends that the unredacted body camera video that suggested his involvement in another criminal offense and referenced his lengthy criminal history constituted inadmissible "other acts" testimony.  However, Hill voluntarily admitted the videos at the hearing on the motion to suppress and at trial.  Therefore, he has waived his right to appeal their admissibility.  *See State v. Smith*, 2017-Ohio-8558, 99 N.E.3d 1230, ¶ 36 (1st Dist.).  The fourth assignment of error is overruled.

### Ineffective Assistance of Counsel

{¶54} In his fifth assignment of error, Hill argues that trial counsel was ineffective for failing to object to the inadmissible bad-acts evidence.  Specifically, he contends that the identification of Hill as the man who threw the brick and references to his prior convictions for burglary were prejudicial.  We note that Hill testified on direct examination that he had thrown the brick after an altercation with a group of white men.

{¶55} To prevail on an ineffective-assistance-of-counsel claim, Hill must show trial counsel's performance fell below an objective standard of reasonableness and he was prejudiced as a result.  *Strickland v. Washington*, 466 U.S. 668, 687-688, 693, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  In order to demonstrate prejudice, Hill must establish that, but for counsel's errors, there is a reasonable probability that the result of trial would have been different.  *State v. Burke*, 97 Ohio St.3d 55,

2002-Ohio-5310, 776 N.E.2d 79, ¶ 6. The failure to make an adequate showing on either prong is fatal to an ineffective-assistance-of-counsel claim. *See Strickland* at 697.

{¶56} Hill's case was tried to the bench, and we must presume that the "court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." *State v. Cowins*, 1st Dist. Hamilton No. C-120191, 2013-Ohio-277, ¶ 10. Although Hill argues that the evidence was inflammatory, he has failed to establish that the court considered the evidence or that there is a reasonable probability that the result of the trial would have been different absent the evidence. The fifth assignment of error is overruled.

{¶57} In his sixth assignment of error, Hill argues that the cumulative effect of all of the errors denied him his right to a fair trial.

{¶58} The doctrine of cumulative error allows a conviction to be reversed if the cumulative effect of errors, deemed separately harmless, deprived the defendant of his right to a fair trial. *See State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. "The doctrine of cumulative error is inapplicable where there are not multiple instances of harmless error." *State v. Leach*, 150 Ohio App.3d 567, 2002-Ohio-6654, 782 N.E.2d 631, ¶ 57 (1st Dist.).

{¶59} After reviewing the record and finding no error in Hill's assignments of error, we cannot find cumulative error. Accordingly, we overrule the assignment of error.

## Conclusion

{¶60} Having considered and overruled all of Hill's assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

14

**CUNNINGHAM, P.J.,** and **DETERS, J.,** concur.

Please note:

      The court has recorded its own entry this date.

