[Cite as *State v. Johnson*, 2019-Ohio-3877.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-170354 |
| | | TRIAL NO. B-1602422 |
| Plaintiff-Appellee, | : | |
| vs. | : | *O P I N I O N.* |
| KEVIN JOHNSON, | : | |
| Defendant-Appellant. | : | |


Criminal Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed

Date of Judgment Entry on Appeal:  September 25, 2019


*Joseph T. Deters*, Hamilton County Prosecuting Attorney, and *Melynda J. Machol*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Bryan Perkins*, for Defendant-Appellant.

Zayas, **Presiding Judge.**

{¶1}   Kevin Johnson appeals his convictions, after a jury trial, for trafficking in and possession of cocaine, both felonies of the first degree, with major-drug-offender specifications.  Johnson contends that the police unlawfully searched his car, the testimony of the state's fingerprint expert should have been excluded, the testimony of several police officers was inadmissible opinion testimony, the evidence was insufficient to sustain the convictions, the convictions were contrary to the manifest weight of the evidence, the prosecutor committed misconduct by failing to provide an expert report, the police unlawfully searched his brother's home, he was denied the right to the effective assistance of counsel, and the cumulative effect of the errors violated his rights.  Finding his assignments of error without merit, we affirm the trial court's judgment.

{¶2}   The following facts are taken from the evidence presented at the motion to suppress and the trial.

### The Freeman House Drug Investigation

{¶3}   Cincinnati Police Officer Eric Schiable, assigned to the Gang Enforcement Unit, received a complaint about drug activity at a home located at 1804 Freeman Avenue.  In response, Schiable and his partner, Officer Phillip Hermann, conducted surveillance on the house.  Schiable observed a Buick Lacrosse pull to the curb in front of the house.  A man, later identified as Odell Neal, exited from the car carrying a brown satchel.  When Neal exited from the car, he appeared very nervous.  He looked around the area as he quickly walked toward the door.

{¶4}   Neal entered the home and exited in a very short amount of time. Again, he appeared extremely nervous as he scanned the area while quickly walking to his car and rapidly pulling away from the curb.  Schiable noticed that Neal was

now carrying the brown satchel tucked tightly under his arm. Schiable called for a uniformed officer to pull him over.

{¶5} Schiable met the officer at the car, and a K-9 drug-detection dog alerted on the car. They searched the vehicle and discovered a large amount of cocaine in the satchel. Neal was arrested and transported to the Colerain Township Police Department. During Schiable's interview, Neal admitted that he had obtained the drugs at the Freeman home from a man nicknamed "Weefie," who was later determined to be Keith Johnson ("Keith"). Keith is Johnson's twin brother. Neal also informed Schiable that he had previously seen drugs in the house, and that drugs were currently being stored in the house. Neal agreed to show Schiable the home where the drugs were located, and he identified the home at 1804 Freeman Avenue.

{¶6} Based on this information, Schiable returned to Cincinnati Police District 1 to draft an affidavit to obtain a search warrant for the home. While drafting the affidavit, he discovered the home was owned by Keith, who had a prior conviction for drug trafficking. Schiable was concerned that any contraband in the home could be removed or destroyed while he was seeking a warrant, so he contacted Officer Mark Bode to watch the home and monitor any activity. Bode was instructed to stop any individual who entered or exited the home to determine the reason for the visit.

{¶7} Bode, who is also assigned to the Gang Enforcement Unit, drove to the home with his partner Officer Weigand. Both were dressed in plainclothes and were driving an unmarked car. Within moments of their arrival, they observed a dark colored Honda sedan park in front of the home. The sole occupant of the car exited

from the vehicle, approached the front door, unlocked the door, and entered the home. The man left within five to ten minutes. He was talking on his cell phone and had the keys in his other hand. He locked the door, walked to the Honda, and drove north on Freeman Avenue.

*The Traffic Stop*

{¶8} Bode followed the Honda and contacted Officer Deon Mack, another member of the Gang Enforcement Unit, and asked him to conduct a traffic stop on the Honda. Mack was in a marked cruiser and was assigned to the unit to provide traffic enforcement support if a traffic stop were necessary. After the Honda passed him on Bank Street approaching Linn Street, Mack pulled out of a parking lot and began to follow it. He observed the Honda make two left turns, onto Linn Street and Central Parkway, without using a turn signal. Before Mack could catch up to the Honda and pull it over, it made a right turn onto Ravine Street, again without using a turn signal.

{¶9} Mack finally caught up to the Honda on McMillan Street approaching Ohio Avenue. Mack pulled behind the car and initiated the stop. Bode and Weigand exited from their car, and Mack approached the driver and requested his license. As the driver opened his wallet, Mack watched him begin to pull out a driver's license then return it to the wallet and pull out a state identification card. Mack testified that it was highly unusual for one person to have both a driver's license and an identification card.

{¶10} The driver, now identified as Johnson, explained that his driver's license was suspended due to a failure to pay child support. Mack asked him to step out of the car, and he exited with his keys in his hand. Mack instructed him, "Can

4

you leave your key, can you drop your key in there?" Johnson reached into the car. Believing he may be retrieving a weapon, Mack immediately grabbed his belt and pulled him out of the car. Concerned that he may have a weapon, Mack patted him down. Mack testified that he handcuffed Johnson because he refused to comply with a simple request. Mack conducted a more thorough search and removed over $2,300 from Johnson's pocket. Mack escorted him to the police cruiser, and one of the officers summoned a K-9 unit.

{¶11} Johnson was read his *Miranda* rights and questioned by Mack. Repeatedly, Mack asked him where he was coming from, and Johnson provided several different answers. Johnson did not mention that he had been at the house on Freeman. When asked about the car, Johnson explained that the car was registered to his mother, but she had given it to his brother. After approximately 30 minutes, Delhi Police Officer Jeff Miller arrived with his drug-sniffing dog Levi. Miller walked his dog around the Honda, and Levi alerted at the open driver's window.

{¶12} The officers searched the car, and Mack discovered a baggie of cocaine in the map pocket behind the passenger seat, and a Menard's bag under the driver's seat. The Menard's bag contained a Walmart bag, and a vacuum sealed bag with a large quantity of cocaine was in the Walmart bag.

{¶13} Johnson was arrested and charged with one count of trafficking in cocaine, in violation of R.C. 2925.03(A)(2), a first-degree felony, with a major-drug-offender specification and one count of possession of cocaine, in violation of R.C. 2925.11(A), a first-degree felony, with a major-drug-offender specification.

### The Search of the Freeman Home

{¶14} After Johnson's arrest, Schiable and his partner Herrman searched the

house on Freeman. Schiable searched the first floor and found a kilo press, 64 grams of cocaine and a digital scale hidden in a microwave in the kitchen, personal paperwork belonging to Keith and Johnson on the tables, and various campaign materials from Johnson's previous campaign for city council. Hermann found 20 grams of cocaine and a digital scale hidden in a hamper in an upstairs bedroom closet. In the corner of the closet, he found a blender and two bags containing Inositol, a substance commonly used as a cutting agent for drugs, in a black shoebox.

{¶15} Based on the cocaine found in the home, both Keith and Johnson were charged with one count of trafficking in cocaine, in violation of R.C. 2925.03(A)(2), a first-degree felony, and one count of possession of cocaine, in violation of R.C. 2925.11(A), a first-degree felony.

### *The Motion to Suppress and Jury Trial*

{¶16} Johnson entered pleas of not guilty to all of the charges. He filed a motion to suppress the evidence found in the home, alleging that the search of the home was unconstitutional because the affidavit contained insufficient facts to support probable cause. Johnson also sought to suppress the drugs found in the car, arguing that the prolonged detention by Mack to await the drug-sniffing dog violated his constitutional rights.

{¶17} After reviewing the affidavit, the trial court found that the facts were sufficient to support the issuing judge's probable-cause determination. The officers' observations of Neal, their pursuit that resulted in the discovery of the drugs, and Neal's statements that he acquired the drugs from a person in the house and that more drugs were present supported the probability that drugs would be found in the home.

{¶18} Schiable, Bode, and Mack testified about their respective roles in the

6

original investigation of the Freeman home and the traffic stop. The video from Mack's body camera and Schiable's affidavit for the search warrant were admitted as exhibits. The court concluded that the duration of the stop was not unreasonable, and that Mack had reasonable suspicion, based on the facts and circumstances, to justify the search of the car. The trial court did not issue any factual findings, and Johnson did not request any.

{¶19} The case proceeded immediately to a jury trial. Hermann testified that he had been conducting drug investigations for 15 years and had extensive training and experience in drug investigations, including stash houses. Most of his investigations involved the use of stash houses. In his experience, when an arrest is made after someone leaves a stash house, another individual may attempt to remove any remaining contraband from the house. He further testified that when a scale is found next to narcotics, drug residue will usually be found on the scale. Based on his experience and observations, he believed that the Freeman house was a stash house because it had no electricity, no bedroom furniture for sleeping, and the home was vacant. Bode and Mack also briefly explained the use of stash houses based on their experience in drug interdiction.

{¶20} Officer Kimberly Horning, a criminalist at the Cincinnati Police Department, testified on behalf of the state as a fingerprint expert. Prior to her testimony, Johnson objected to her testifying as an expert because he had not received an expert report, she was not disclosed as an expert witness, and her CV was not timely provided. The state claimed that it had provided an expert report that consisted of the evidence examination worksheet that contained the results of the fingerprint analysis. The trial court concluded an expert report was filed, and conducted a hearing, outside of the presence of the jury, to determine whether Horning was qualified to testify as an expert.

{¶21} Horning, who had obtained a bachelor's degree in political science

with a minor in criminal justice, had been a police officer for six years before applying to become a criminalist. As a patrol officer, she acquired her own fingerprint kit and started conducting her own fingerprinting. After becoming a criminalist in 2013, she took a 40-hour fingerprint-analysis course, a 24-hour course on palm-print comparison, and several four-hour courses at the national conference of the International Association for Identification. In 2014, Horning became certified as an evidence technician, but she had not obtained her certification in fingerprint analysis. As a criminalist, she had testified in court approximately six times about fingerprints and the processing to develop a fingerprint, but not in depth about fingerprint analysis. Based on her experience and qualifications, the court allowed her to provide expert testimony.

{¶22} Horning testified that she found a latent fingerprint on the Menard's bag that contained the Walmart bag and the cocaine found underneath the driver's seat of the Honda. Horning further explained her methodology to recover, preserve, and analyze a latent print, and how she used this methodology to preserve, compare, and analyze the latent print from the bag.

{¶23} Horning entered the fingerprint into the Automated Fingerprint Identification System, picked the points and ridge event details that made the print unique, and ran it through the system. The system returned 20 possible candidates with Johnson at the top of the list. After she conducted a side-by-side comparison with Johnson's fingerprint card, she determined the print was from Johnson's left thumb and sent her results to another examiner who verified the match. She also found two prints from Darryl Jones, and an unidentified partial palm print.

{¶24} After the state rested, Johnson called his brother Keith to testify. Keith admitted that he had had a prior conviction for drug trafficking. He also testified that he owned the Freeman home, and that he shared the Honda with his

brother. Keith testified that the drugs found in the Freeman home were his, and that he had sold drugs to Neal. He had pled guilty to the charges related to the drugs found in the Freeman home. He further testified that Johnson had no knowledge of the drugs in the Freeman home. When asked if the drugs found in the Honda belonged to him or if he had put the drugs in the Honda, Keith asserted his Fifth Amendment privilege against self-incrimination.

{¶25} Finally, Johnson testified on his own behalf. He testified that he was renovating the home on Freeman and a home on Findlay. At approximately noon that afternoon, his brother had picked him up, and they arrived at the Freeman house to meet a contractor at 12:30 p.m. After walking through the Freeman house, Johnson and the contractor walked to the Findlay home, while Keith stayed at Freeman. When Johnson returned, his brother and he left to run errands. Later that afternoon Keith drove to his home, and Johnson took the Honda.

{¶26} Johnson returned to Freeman to meet with a neighbor who was interested in buying the home. She called to reschedule the appointment, so he locked the back door of the home and left. Johnson was pulled over shortly after leaving the Freeman home. Johnson testified that he was nervous and scared because he did not know why the officer asked him to get out of the car for a traffic violation. When Mack asked him to drop the keys, Johnson reached into the car to put the keys in the ignition.

{¶27} When asked about the large amount of cash in his pocket, Johnson explained that he had collected $750 in rent from a tenant, he had withdrawn $300 from his credit union, and the rest was from a Huntington account and a BB&T account. He further explained that, as part of his rehabbing business, he purchases all of the material for the contractors in cash and gives the receipt to the contractor. That way, if the contractor has to return any items, the contractor can return it. If he were to pay for the materials with a credit or debit card, Johnson would have to be

present with the card for any returns.

{¶28} Johnson further testified that he did not see the drugs that were under the driver's seat and in the back passenger map pocket, he did not place the drugs in the car, and he did not that know the drugs were in the car.

{¶29} After deliberations, the jury found Johnson guilty of the possession and trafficking charges related to the cocaine found in the Honda, and not guilty of the charges related to the cocaine in the Freeman house. Johnson timely appealed.

### The Searches of the Honda and the Freeman House

{¶30} For ease of discussion, we address the assignments of error out of order.

{¶31} In his first and seventh assignments of error, Johnson contends that the trial court erred in overruling his motion to suppress because the officer unlawfully searched his car and the search warrant for the Freeman house was invalid.

{¶32} Appellate review of a motion to suppress presents a mixed question of law and fact. Ordinarily, we accept the trial court's findings of fact as true if competent, credible evidence supports them, and we independently determine whether the facts satisfy the applicable legal standard. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. However, when the trial court makes no factual findings, we review the record to determine whether the evidence was sufficient to support the denial of the motion. *See State v. Pate*, 1st Dist. Hamilton Nos. C-130490 and C-130492, 2014-Ohio-2029, ¶ 11.

{¶33} Johnson first contends that the search of the car was the result of his unconstitutional arrest for driving under suspension. Although Mack admitted that he arrested Johnson based on his erroneous belief that driving under suspension was a misdemeanor of the first degree, the search was the result of the alert by the drug

dog, and not the arrest.

{¶34} Johnson next argues that the search of the car was unconstitutional because Mack unreasonably prolonged the traffic stop to await the drug-sniffing dog and to conduct the drug sniff. Johnson does not challenge the legality of the traffic stop for the failure to use his turn signals. Rather, he contends that Mack did not have a reasonable suspicion to prolong his detention.

{¶35} "When detaining a motorist for a traffic violation, an officer may delay a motorist for a time sufficient to issue a ticket or a warning." *State v. Batchili*, 113 Ohio St.3d 403, 2007-Ohio-2204, 865 N.E.2d 1282, ¶ 12, quoting *State v. Keathley* 55 Ohio App.3d 130, 131, 562 N.E.2d 932 (2d Dist.1988). However, "the detention of a stopped driver may continue beyond [the normal] time frame when additional facts are encountered that give rise to a reasonable, articulable suspicion of criminal activity beyond that which prompted the initial stop." (Citations omitted.) *Batchili* at ¶ 15. "An officer may expand the scope of the stop and may continue to detain the vehicle without running afoul of the Fourth Amendment if the officer discovers further facts which give rise to a reasonable suspicion that additional criminal activity is afoot." *State v. Rose*, 4th Dist. Highland No. 06CA5, 2006-Ohio-5292, ¶ 17, citing *State v. Robinette*, 80 Ohio St.3d 234, 240, 685 N.E.2d 762 (1997). "[I]f a law enforcement officer, during a valid investigative stop, ascertains 'reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual.' " *Rose* at ¶ 17. The "reasonable and articulable" standard must be evaluated in light of the totality of circumstances. *Id.* at ¶ 17, citing *United States v. Arvizu*, 534 U.S. 266, 274, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002).

{¶36} Our review of the record leads us to conclude that the detention was independently supported by reasonable, articulable suspicion to await the drug-sniffing dog. Johnson had just left a house that the police were securing a warrant to

11

search because it had been the site of drug trafficking earlier that afternoon. Johnson, who had a key to the front door, had just accessed the home. When questioned by Mack, Johnson did not disclose that he had just come from the Freeman home and provided several different answers to Mack's questions. After the initial stop, Johnson reached into the car, and he was nervous throughout the stop. Finally, Johnson had a large amount of cash in his pocket. These additional specific and articulable facts provided the officer with reasonable suspicion of criminal activity to justify detaining Johnson beyond the initial traffic violation. *See Batchili* at ¶ 15.

{¶37} With respect to the search warrant for the Freeman home, we find that that assignment of error is moot because Johnson was found not guilty of the charges related to the search of the Freeman home.

{¶38} Accordingly, we overrule the first and seventh assignments of error.

### The Testimony of the Fingerprint Expert

{¶39} In the second and sixth assignments of error, Johnson argues that the trial court erred in admitting Horning's testimony, and the prosecutor committed misconduct by presenting her testimony. Johnson first contends that the trial court erred in permitting the expert testimony of Horning because the state failed to provide an expert report, and she was not qualified to testify as an expert. Johnson further argues that he was prejudiced by the testimony because the fingerprint was the only evidence that connected him to the drugs found in the car.

{¶40} Crim.R. 16(K) requires the disclosure of a written expert report at least 21 days before trial, and the report must summarize "the expert witness's testimony, findings, analysis, conclusions, or opinion, and shall include a summary of the expert's qualifications." "Crim.R. 16(K) mandates exclusion of expert testimony where a written report has not been disclosed in accordance with the rule." *State v. Walls*, 2018-Ohio-329, 104 N.E.3d 280, ¶ 31 (6th Dist.).

{¶41} Here, the state argued that it provided Johnson with an expert report in the form of an evidence examination worksheet that contained the results of the fingerprint analysis. Our record reflects that the state filed a discovery response on August 9, 2016, indicating that the prosecutor had provided Johnson with the fingerprint lifts, reports, and all documents and charts pertaining to the fingerprint. At trial, Horning testified that the evidence examination sheet was filled out by police officers and contained basic details of the investigation, such as date and time of the offense, the investigating officer, and possible suspects.

{¶42} However, the evidence examination worksheet was not entered as an exhibit or otherwise placed in the record to preserve the issue for appellate review. Because the document is not included in the record, Johnson cannot establish that the evidence examination worksheet did not constitute an expert report. *See State v. Darrah*, 12th Dist. Warren No. CA2006-09-109, 2007-Ohio-7080, ¶ 29.

{¶43} Next, Johnson argues that the trial court abused its discretion in qualifying Horning as an expert in fingerprint analysis and comparisons. However, Johnson offers no reason to support his claim that Horning was not properly qualified under Evid.R. 702. Horning testified that she completed numerous courses on fingerprint analysis and verification, palm-print comparisons, fingerprint development, and fingerprint distortions. In the three-and-a-half years that she was a certified criminalist, she had recovered thousands of prints and analyzed hundreds. Finally, Horning testified that she is a member of the International Association for Identification and reviews their monthly publications to keep abreast of the latest developments.

{¶44} Based on her training and qualifications, the trial court did not abuse its discretion by concluding that Horning had "specialized knowledge, skill, experience, training, or education" regarding fingerprint evidence as required by Evid.R. 702(B). *See State v. Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d

319, ¶ 121.  We overrule the second assignment of error.

{¶45}  Johnson further asserts, in the sixth assignment of error, that the prosecuting attorney committed misconduct by presenting Horning's testimony without providing a report.   Because we have concluded that Johnson did not establish that the state failed to provide an expert report, we overrule the sixth assignment of error.

### Admission of Officers Testimony about Stash Houses

{¶46}  In the third assignment of error, Johnson contends that the trial court abused its discretion in allowing three police officers to testify as to their lay opinions about stash houses.  A police office may offer lay opinion testimony under Evid.R. 701 if it is based on the officer's perceptions through experience and training.  *See State v. Martin*, 1st Dist. Hamilton No. C-150054, 2016-Ohio-802, ¶ 16.  A review of the record confirms that the officers' testimony was confined to their perceptions based on their extensive experience and training.  We find no abuse of discretion in admitting the testimony, and overrule the third assignment of error.

### Sufficiency and Manifest Weight

{¶47}  In the fourth and fifth assignments of error, Johnson claims his convictions were not supported by sufficient evidence and were against the manifest weight of the evidence.

{¶48}  In a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found all the essential elements of the crime proved beyond a reasonable doubt.  *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When considering a challenge to the weight of the evidence, the court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and

created a manifest miscarriage of justice. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983), paragraph three of the syllabus.

{¶49} Johnson contends that the evidence was insufficient because no evidence was presented that he touched or handled the drugs. However, in order to prove possession, the state need only show that Johnson constructively possessed the drugs by exercising control and dominion over them, even if the drugs were not in his immediate physical possession. *See State v. Jackson*, 1st Dist. Hamilton No. C-110570, 2012-Ohio-2727, ¶ 14, citing *State v. Wolery*, 46 Ohio St.2d 316, 329, 348 N.E.2d 351 (1976). Control and dominion may be proven by circumstantial evidence. *See State v. Taylor*, 78 Ohio St.3d 15, 676 N.E.2d 82 (1997). Evidence that the defendant was in close proximity to where drugs are found constitutes some evidence of constructive possession. *See State v. Brown*, 1st Dist. Hamilton No. C-120327, 2013-Ohio-2720, ¶ 43. "Thus, when one is the driver of a car in which drugs are within easy access of the driver, constructive possession may be established." *State v. Fry*, 4th Dist. Jackson No. 03CA26, 2004-Ohio-5747, ¶ 41.

{¶50} At trial, the state presented evidence that Johnson was driving the car where cocaine was found underneath the driver's seat. Additionally, Johnson's fingerprint was found on the bag containing the cocaine. Thus, the record contains sufficient evidence for the jury to conclude that the state had proven possession beyond a reasonable doubt. *See Jenks* at paragraph two of the syllabus.

{¶51} Johnson further argues that his testimony that he was unaware of the drugs found in the Honda was credible, and that Keith had access to the car and "pled the fifth" when asked about the drugs in the car. In essence, Johnson is arguing that the jury should have believed his testimony and concluded that the drugs in the car belonged to his brother.

{¶52} However, it is well settled law that matters as to the credibility of

witnesses are for the trier of fact to resolve. *See State v. Railey*, 2012-Ohio-4233, 977 N.E.2d 703, ¶ 14 (1st Dist.). "Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses." (Citations omitted.) *State v. Hill*, 1st Dist. Hamilton No. C-170507, 2018-Ohio-3130, ¶ 33.

{¶53} Here, the jury was free to discount Johnson's testimony that he was unaware of the drugs in the car. Based on our review of the record, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse Johnson's convictions and order a new trial.

{¶54} Accordingly, we overrule Johnson's fourth and fifth assignments of error.

### Ineffective Assistance of Counsel

{¶55} In his eighth assignment of error, Johnson argues that his counsel was ineffective for failing to preserve all issues for appeal and failing to make all reasonable objections at trial. To prevail on an ineffective-assistance-of-counsel claim, Johnson must demonstrate that counsel's performance fell below an objective standard of reasonableness, and he was prejudiced as a result. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶56} However, Johnson has not cited to the record or presented any specific instances where his counsel was ineffective. To be considered on appeal, errors must be identified by citation to the record. App.R. 16(A); *State v. Rucker*, 1st Dist. Hamilton No. C-110082, 2012-Ohio-185, ¶ 32. Accordingly, we disregard the assignment of error. *See* App.R. 12 (A)(2).

### Cumulative Error

{¶57} In his ninth assignment of error, Johnson alleges that the cumulative effect of all of the errors denied him his right to a fair trial. The doctrine of cumulative error allows a conviction to be reversed if the cumulative effect of errors,

deemed separately harmless, deprived the defendant of his right to a fair trial. *See State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987), paragraph two of the syllabus. "The doctrine of cumulative error is inapplicable where there are not multiple instances of harmless error." *State v. Leach*, 150 Ohio App.3d 567, 2002-Ohio-6654, 782 N.E.2d 631, ¶ 57 (1st Dist.).

{¶58} After reviewing the record and finding no error in Johnson's assignments of error, we cannot find cumulative error. Accordingly, we overrule the ninth assignment of error.

## Conclusion

{¶59} Having considered and overruled all of Johnson's assignments of error, we affirm the judgment of the trial court.

Judgment affirmed.

**CROUSE** and **WINKLER, JJ.,** concur.

Please note:

The court has recorded its own entry this date.